2023 IL App (1st) 220372
No. 1-22-0372
Opinion filed December 22, 2023

SIXTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 00 CR 1357201 |
| | ) | |
| | ) | |
| ABDUL MALIK MUHAMMAD, | ) | Honorable |
| | ) | Lawrence Flood, |
| Defendant-Appellant. | ) | LeRoy K. Martin, Jr. |
| | ) | Erica L. Reddick, |
| | ) | Judges Presiding |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Justice Tailor concurred in part and dissented in part, with opinion.

## OPINION

¶ 1     For more than two decades, scores of criminal convictions in Chicago have been reversed due to confessions elicited through torture. This appeal involves allegations of a tortured confession and a conflict of interest by the special prosecutor appointed to probe it. Our determination of these two issues impacts the fairness, transparency, and effectiveness of the process established to redress a notorious injustice that has blemished the reputation of the Chicago Police Department and the overwhelming majority of officers who faithfully serve with honor.

¶ 2    Abdul Malik Muhammad, convicted of a 1999 shooting death, made allegations to the Illinois Torture Inquiry and Relief Commission that police officers of Area 2 extracted a statement from him through torture. In 2018, the Commission supported Muhammad's claim, which required Muhammad to move the circuit court to appoint a Special State's Attorney. In similar cases, Robert J. Milan was named the Special State's Attorney. Milan's appointment followed the decision by the Cook County State's Attorney's Office that it could not be involved because an alleged torturer of Muhammad, Detective Michael McDermott, had worked for the State's Attorney's office as an investigator after he retired from the Chicago Police Department.

¶ 3    Milan later filed a motion to terminate the proceedings, arguing that Muhammad's "confession" fell outside the Act's purview. The circuit court granted Milan's motion without an evidentiary hearing.

¶ 4    Meantime, Muhammad's counsel challenged Milan as having a conflict of interest like that of the State's Attorney's Office and sought to rescind Milan's appointment. The circuit court denied several attempts to remove him.

¶ 5    Muhammad argues that the circuit court erred in dismissing his claim without an evidentiary hearing and refusing to remove Milan due to an actual conflict of interest. We agree because Milan is in the unusual position of having to judge himself and those who were his subordinates.

¶ 6    At the evidentiary hearing on remand, the circuit court should decide the merits of Muhammad's claim that he was tortured into giving the statement as well as the possible *Brady* violation relating to the State's alleged failure to disclose that Muhammad participated in multiple lineups in which several witnesses did not identify him.

¶ 7    While the panel is unanimous on the disposition concerning the evidentiary hearing on remand, there is disagreement on the second issue involving Milan's conflict of interest. In light of all that Milan has disclosed in the record, we find that his staying on as special prosecutor violates Muhammad's right to a prosecutor unencumbered by conflicting loyalties and potentially prejudicial inclinations.

¶ 8    The dissent, however, finds no grounds to remove Milan. This approach deprives Muhammad of his right to a prosecutor unencumbered by conflicting loyalties and potentially prejudicial inclinations, all of which cast doubt on the integrity and legitimacy of the entire process. Had Milan been forthcoming at the hearing on his appointment, the judge, with input from Muhammad's counsel, would have been able to resolve his eligibility to serve. Instead, Milan remained silent, earning thousands of dollars in compensation and overseeing a case involving an underling at the State's Attorney's Office who Mohammad alleged had tortured him when he was a police officer. His actual conflict exposed, Milan cannot remain in place. As recognized almost 100 years ago, "No system of justice can rise above the ethics of those who administer it." National Wickersham Commission on Law Observances and Law Enforcement, 1929. Accordingly, we reverse the circuit court's orders denying Muhammad's motions to rescind Milan's appointment and remand for the appointment of a special prosecutor free of conflicts of interest.

¶ 9                                          Background

¶ 10    The State charged Muhammad with three counts of first-degree murder and two counts of aggravated discharge of a firearm for the May 4, 1999, shooting death of Damone Mims.

Following conviction by a jury, Muhammad was sentenced to 50 years' imprisonment. *People v. Muhammad*, No. 1-02-0053 (unpublished order under Supreme Court Rule 23).

¶ 11   In 2014, Muhammad submitted a claim of torture to the Illinois Torture Inquiry and Relief Commission (TIRC) under section 40/45 of the Act (775 ILCS 40/45 (West 2018)) alleging (i) he had been "interrogated for four days at Area 2 in a cell that did not have a bed, food, toilet, or water," (ii) "Detective [Michael] McDermott threatened him, boasting that he 'kn[ew] how to get [Muhammad] to confess without leaving a mark' " and "aggressively slammed a large casefile on the table, closed the interrogation room door and told his colleagues *** that he needed a moment alone with [Muhammad]," (iii) alone with Muhammad, McDermott used racial intimidation by telling him that "a jury would be more likely to believe white witnesses than a black defendant," and (iv) during two of four lineups, Muhammad was "forcefully held" by the arm.

¶ 12   Muhammad's alleged statement was included in a police report prepared by Detective McDermott. Detective Fidyk, McDermott's partner, testified at trial that Muhammad made admissions during an interview after being Mirandized. According to Fidyk, Muhammad told him that "he was a Vice Lord. Member of the Vice Lord street gang from around 79th and Dobson. He denied any knowledge of the aggravated battery case report, which he was the victim, the one that was assigned to myself. He said he had no knowledge of the murder and knew that there was an arrest warrant for him regarding this case and he went to Washington." On redirect, Fidyk testified that Muhammad "stated that he knew of the warrant for his arrest and he decided to move to Washington to turn his life around."

¶ 13 The Commission investigated Muhammad's claims. When questioned by the Commission staff, Muhammad's "allegations expanded, and he claimed he was actually beaten by McDermott with a case file on the head, denied food, forced to urinate on the floor and to defecate into a shirt in his interrogation room because he was denied bathroom use." According to the Commission, Muhammad never claimed he had been abused at trial or on appeal. The Commission further stated, "[Muhammad]'s own attorney noted to [the Commission] that *** there was no 'confession' in the traditional sense *** only partially incriminating statements."

¶ 14 The Commission voted on July 18, 2018, to refer the matter for judicial review, though it noted "severe reservations about [Muhammad]'s credibility in regards to his claims of physical abuse." Yet, the trial record indicates that Muhammad asserted an alibi defense and argued his statement collaborated with his alibi defense. At trial, Muhammad's grandmother, Flora Walker, testified that Muhammad came to stay with her in Seattle on May 3, 1999, the Monday before Mother's Day and the day before Mims' murder, because he had been beaten up. She picked up her grandson at the airport between 12:15 and 1:00 p.m. In closing argument, defense counsel used Muhammad's statement to Detective Fidyk to reinforce Muhammad's mother's testimony that Muhammad had left for Seattle long before police ever issued the warrant.

¶ 15 At the jury instruction conference, defense counsel said Muhammad wanted to "turn this into a second-degree murder case." Before closing arguments, defense counsel asked for a "second degree instruction because there is some evidence that my client was the victim of a beating" on May 1st. The State objected. The trial judge recognized that Muhammad may be entitled to instructions on inconsistent defenses but denied the request, finding "there is no testimony that he was acting in the heat of passion."

¶ 16    The Commission concluded that even though Muhammad had not confessed to the murder, the statement he made to Fidyk came within the Commission's administrative rule of a " 'tortured confession' includ[ing] any incriminating statement, vocalization, or gesture alleged by police or prosecutors to have been made by a convicted person that the convicted person alleges were a result of (or, if the convicted person denies making the statements, occurred shortly after) interrogation that the convicted persons claims included torture." 20 Ill. Adm. 2000.10. The Commission further stated that the involvement of "[Jon] Burge Detective" McDermott, who had well-documented findings of abuse, and a possible *Brady* violation based on the State's failure to disclose non-identifications of Muhammad after multiple lineups, amounted to "sufficient credible evidence of torture meriting judicial review."

¶ 17    In November 2018, Muhammad's counsel moved to have the Office of the Special Prosecutor (OSP) and Robert Milan (collectively, "Milan") appointed, given that the Cook County State's Attorney's Office (SAO) had concluded its involvement would be inappropriate as Detective McDermott worked for the State's Attorney's office as an investigator after he retired from the Chicago Police Department. Milan was appointed as the special prosecutor for the "Burge-related" cases in April 2017 and led the OSP after the previous special prosecutor resigned. The presiding judge of the criminal division appointed Milan on November 20, 2018.

¶ 18    After his review, Milan concluded that the evidence against Muhammad was overwhelming and the OSP would continue to defend the conviction. After that, on August 20, 2020, Milan moved the circuit court to terminate the proceedings on the basis that Muhammad had not articulated a claim of torture under the Act. Milan took the position that Muhammad's statement to Detective Fidyk did not amount to a "confession" as defined by Illinois law and required by

the Act. Milan believed that the Commission did not have the authority to expand the scope of its statutory mandate by adopting regulations defining a "confession" more broadly.

¶ 19 For the *Brady* violation, Milan argued that the Act specifically limits the Commission's authority to conduct inquiries into "claims of torture," defined as "a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence related to allegations of torture." 775 ILCS 40/5(1) (West 2018). Relatedly, Milan argued that the Commission expressly found that Muhammad's allegations of abuse were not credible but still referred the matter for judicial review.

¶ 20 Shortly afterward, Muhammad filed a "Motion to Rescind" Milan's appointment as the special prosecutor, claiming: (i) Milan's appointment was improper under the statute (55 ILCS 5/3-9008 (West 2018)); (ii) Milan suffered a disabling conflict of interest based on his service as the First Assistant State's Attorney and Supervisor of Felony Review for the Cook County State's Attorney's Office; and (iii) even if no actual conflict of interest existed, Milan's appointment created an appearance of impropriety. Milan responded that his appointment adhered to the statute under which he continued the ongoing work as the "Burge" special prosecutor after his predecessor retired. Further, he did not suffer from a conflict of interest based on his SAO service, where he was not personally involved in Muhammad's case, and the attempts to have him removed smacked of "gamesmanship" since Muhammad waited two years to seek removal and did so after Milan filed the motion to terminate.

¶ 21 After hearing arguments on the motions, the presiding judge of the criminal division denied Muhammad's motion to rescind, finding Muhammad's motion untimely and Milan's appointment proper and consistent with the original order appointing a special prosecutor for the entire class of Burge cases.

¶ 22 Muhammad filed a motion to reconsider. On January 21, 2021, a different presiding judge struck that motion, stating she would not reconsider her predecessor's decision. Muhammad filed a motion for leave to file a petition for *mandamus* or prohibition or, in the alternative, a motion for supervisory order challenging the ruling. On March 5, 2021, the Supreme Court denied the motion. *Muhammad v. Reddick*, No. 126977.

¶ 23 Muhammad filed a "new" motion to rescind Milan's appointment, again arguing that Milan's positions at the SAO created a disabling conflict of interest requiring his disqualification under the governing statute (55 ILCS 5/3-9008 (West 2018)) and asserting that Milan could be a witness in the proceedings in Muhammad's case based on a memorandum his counsel had recently obtained. The memorandum, sent to Milan in 1999 by an Assistant State's Attorney in the felony review unit, regarded the alleged torture of a different defendant during the felony review process. Milan argued that the memorandum was irrelevant as it addressed a different murder committed by an unrelated offender and involved different detectives from a different Chicago police headquarters. The presiding judge of the criminal division rejected Muhammad's arguments and denied the motion.

¶ 24 Muhammad filed a Motion for Supervisory Order to which Milan objected. The Supreme Court denied Muhammad's motion on September 9, 2021. *Muhammad v. Reddick*, No, 127592.

¶ 25 On November 5, 2021, Muhammad, in his response to the motion to terminate, argued that his alleged statement to Detective Fidyk constituted an inculpatory statement used by the prosecution to establish his consciousness of guilt and fell within the Commission's definition of a confession. In addition, the court must give the Commission's interpretation of the statute the force and effect of law. Finally, Milan waived challenging the propriety of the Commission's referral for judicial review by waiting over two years to file the motion to terminate, and the Commission could rely on the alleged *Brady* violations as corroboration of his claims of abuse.

¶ 26 Milan replied that Muhammad's statement to Detective Fidyk did not amount to a confession under Illinois law. Milan also argued (i) the Commission exceeded its statutory authority when it adopted an administrative rule defining a "claim of torture" broader than the definition adopted by the legislature, (ii) the Commission improperly referred the matter for judicial review where its formal disposition stated that Muhammad's claims of abuse were not credible; (iii) the Commission exceeded its authority by relying on an alleged *Brady* violation unrelated to a torture claim as a basis for a referral for judicial review, which instead should be brought in a postconviction petition, and (iv) the Commission's referral does not conform to the restrictions of the Act depriving the court of subject matter jurisdiction, a defect that cannot be waived or forfeited.

¶ 27 The circuit court heard arguments on the State's motion to terminate and took the matter under advisement. On February 10, 2022, Muhammad sought leave to file an "amended" post-conviction petition, adding (i) the torture claims as well as the alleged *Brady* violation identified in the Commission's referral, (ii) a claim of actual innocence based on the fact that his statement

was obtained through coercion by detectives, (iii) prosecutorial misconduct at trial, and (iv) ineffective assistance of his trial and appellate counsel.

¶ 28     On March 11, 2022, the circuit court granted Milan's motion to terminate. The circuit court held it "[is] not bound by the conclusions made by the Commission in making a referral" and "does not review the actions of the Commission in making the referral to determine whether they were appropriate." The court explained that it would not dismiss the referral "based upon the actions of the Commission in making the referral," as Milan requested, because the judiciary and the Commission have distinct roles and responsibilities. The court stated that "[t]he Commission acts to determine whether there is enough evidence of torture to merit judicial review. The Court makes the final determination of whether the provisions of the statute have been met."

¶ 29     Then the circuit court determined that Muhammad's statement to Detective Fidyk did not involve a "confession" within the meaning of the Act:

> "[T]he issue for the Court [] to decide at an evidentiary hearing is whether the defendant was tortured into confessing to the crime for which he was convicted, and the tortured confession was used to convict.
>
> As the full statement entered into evidence in this particular case at trial, it states as follows: He said, meaning the defendant, he said he was a Vice Lord member, a member of the Vice Lords street gang from around 79th and Dotson. He denied any knowledge of the aggravated battery case report which he was the victim. He said he had no actual knowledge of the murder and that he knew there was an arrest warrant for him regarding the case, and he went to the State of Washington.

That is characterized in the referral as a confession. [Muhammad's counsel] has argued in her motion that she believes that the detectives fabricated that statement, but that was characterized by the Commission as the confession.

The problem is that the statement is not a confession based upon case law. There are a number of cases throughout the years that have specifically defined 'confession' going back to the case of People versus Nitti, N-i-t-t-i, from 1924. In that case, the Court stated that a confession is a direct acknowledgment of guilt on the part of the accused, either by statements of the details of the crime or an admission of the ultimate facts.

\*\*\*

Clearly, the statement entered at trial was not a confession. Looking at the full statement, it is an exculpatory -- it is exculpatory in nature.

[Muhammad] denies the murder and any knowledge of the facts prior to the murder. In the statement, he also makes certain admissions. He was a Vice Lord, he knew about the warrant issued for his arrest, and he went to the State of Washington to turn his life around. Such admissions do not equal a confession.

As the Illinois Supreme Court held in People versus Jeorgev, J-e-o-r-g-e-v, 38 Ill. 2d 165, a 1967 case, a confession must acknowledge all the elements of the crime and is a confession of guilt. In this case, the State argued in closing arguments at trial that his statement and his flight to Washington should be -- should show consciousness of guilt. The State argued it to counter the defendant's alibi defense.

\* \* \*

Neither the trial transcript nor the Appellate Court affirmance of the case makes

reference to any confession being introduced at trial. Contrary to the Commission's referral of a tortured confession used to convict the defendant in this matter, there's no confession presented."

¶ 30 The circuit court noted that the Commission "had serious concerns about [Muhammad's] credibility." Regarding the alleged *Brady* violations, they should not be incorporated into Muhammad's torture claims because that would require an evidentiary hearing on the relevant part of the Commission's referral.

¶ 31 The circuit court terminated the proceedings on the Commission's referral and granted Muhammad leave to file his successive postconviction petition.

¶ 32 Analysis

¶ 33 We note that the Attorney General of the State of Illinois and the Solicitor General, on behalf of the Commission, filed an *amicus curiae* brief in support of Muhammad. Their brief raises essentially the same arguments as Muhammad, seeking to reverse the circuit court's denial of his claims under the Act.

¶ 34 The Act provides "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture [.]" 775 ILCS 40/10 (West 2020). An eight-member Commission was established to effectuate this purpose. 775 ILCS 40/15 (West 2020). When the Commission receives a claim of torture, it hears the evidence and votes on an appropriate disposition. 775 ILCS 40/45 (West 2020). If at least five of the eight members conclude by a preponderance of the evidence that there is sufficient evidence of torture, the Commission refers the matter to the circuit court for further review. 775 ILCS 40/50 (West 2020).

¶ 35 On receipt, the circuit court proceeds to an evidentiary hearing unless it finds that the

Commission's "threshold determination was itself against the manifest weight of the evidence." *People v. Johnson*, 2022 IL App (1st) 201371, ¶ 76. If the court proceeds with an evidentiary hearing, the hearing is akin to a third-stage evidentiary hearing under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2020)). *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 51. The circuit court may receive proof by affidavits, depositions, oral testimony, or other evidence. 775 ILCS 40/50 (West 2020). Similar to post-conviction proceedings, the Illinois Rules of Evidence do not apply so that defendants may present evidence they may not have otherwise been able to present at trial. *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 128.

¶ 36　　　　When considering a Commission referral, the court must determine whether the outcome of the original suppression hearing would likely have been different if the officers who denied torturing the defendant had been subject to impeachment based on newly discovered evidence that those officers engaged in a pattern of abusive tactics in other cases. *People v. Smith*, 2022 IL (1st) 201256-U, ¶ ¶92, 95-96; *Johnson*, 2022 IL App (1st) 201371, ¶ 76 ("based on the evidence adduced at the evidentiary hearing, the circuit court can independently make factual findings as to whether torture actually occurred"); *cf. People v. Galvan*, 2019 IL App (1st) 170150, ¶ 68; *People v. Whirl*, 2015 IL App (1st) 11483, ¶80. As for pattern and practice, the circuit court is charged with looking at the similarity "between the misconduct at issue in the present case and the misconduct shown in other cases, such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior." *People v. Jackson*, 2021 IL 124818, ¶ 34.

¶ 37　　　　　　　　　　The Commission's Definition of "Tortured Confession"

¶ 38　　　　Muhammad argues that the circuit court erred by dismissing the Commission's referral

without an evidentiary hearing. Specifically, Muhammad claims that the court misstated its role in judicial review in not giving proper deference to the Commission as an administrative body or following the Commission's regulatory definition of the term "tortured confession." Milan argues that the circuit court properly terminated the proceedings without an evidentiary hearing because the undisputed facts demonstrated that Muhammad could not establish he was "tortured into confessing to the crime" as the Act required (775 ILCS 40/5(1) (West 2020)), where Muhammad's statement to Detective Fidyk did not rise to the level of a "confession" under the plain meaning of the word.

¶ 39    Under the Act, a "claim of torture" means an assertion on behalf of a person convicted in Illinois that "he [or she] was tortured into confessing to the crime for which the person was convicted and the *tortured confession* was used to obtain the conviction and for which there is some credible evidence related to allegations of torture occurring." (Emphasis added.) 775 ILCS 40/5(1) (West 2020). Both parties acknowledge that the Act does not define "tortured confession."

¶ 40    Muhammad contends that in denying him an evidentiary hearing because his statement to Detective Fidyk did not amount to a confession, the court failed to consider the definition of "tortured confession" the Commission adopted or how it applied to the statement he made to Detective Fidyk. 20 Ill. Adm. Code. § 2000.10. The Commission defined a "tortured confession" as "any incriminating statement * * * that the convicted person alleges [was] the result of [an] interrogation that the convicted person claims included torture." 20 Ill. Adm. Code. § 2000.10; see *People v. Bonutti*, 212 Ill. 2d 182, 188 (2004) (administrative rules have "force and effect of law and are to be construed according to the same standards that govern the

construction of statutes").

¶ 41    Milan responds that the court's definition of confession adopted the meaning of "confession" found repeatedly in Illinois caselaw. Milan further argues that the Commission's definition of "tortured confession," which includes "incriminating statements," exceeds the power granted the Commission because the meaning of "confession" as used in the Act is unambiguous.

¶ 42                            Standard of Review

¶ 43    When reviewing a circuit court's decision on a Commission referral, we employ a different standard of review for issues of law and fact. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 195. We defer to the circuit court's findings of fact unless they are against the manifest weight of the evidence, which occurs only where the opposite conclusion is "clearly evident, plain, and indisputable." *Tyler*, 2015 IL App (1st) 123470, ¶ 195. The circuit court did not make factual findings since it terminated the proceedings before receiving evidence. We review legal conclusions *de novo*; that is, we owe no deference to the circuit court and perform the same analysis as the trial judge. *Id*.

¶ 44                          Statutory Construction

¶ 45    The fundamental principle of statutory construction involves determining and giving effect to the legislature's intent. *People v. Reese*, 2017 IL 120011, ¶ 30. The statutory language provides the best indication of legislative intent. *Reese*, 2017 IL 120011, ¶ 30. "When the meaning of a statute is not clearly expressed in the statutory language, a court may look beyond the language [used] and consider the purpose behind the law and the evils the law was designed to remedy. When the language of an enactment is clear, it will be given effect without resort to

other interpretative aids." (Internal citations omitted.). *Petersen v. Wallach*, 198 Ill. 2d 439, 444-45 (2002).

¶ 46    Illinois law has long provided that an administrative agency is a "creature of statute" with "no general or common law powers." *Goral v. Dart*, 2020 IL 125085, ¶ 33; *Schalz v. McHenry County Sheriff's Dept. Merit Comm'n*, 113 Ill. 2d 198, 202 (1986). Instead, an "agency is limited to those powers granted to it by the legislature in its enabling statute." *Prate Roofing & Installations, LLC v. Liberty Mutual Ins. Corp.*, 2022 IL 127140, ¶22. An administrative agency administrates and enforces the statute; courts give deference to the agency's interpretation of statutory ambiguities. *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 370 (2007); *Taddeo v. Board of Trustees of the Illinois Municipal Retirement Fund*, 216 Ill. 2d 590, 595 (2005); *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 48 (2002). Thus, " '[a] court will not substitute its own construction of a statutory provision for a reasonable interpretation adopted by the agency charged with the statute's administration.' " *Hadley*, 224 Ill. 2d at 371 (quoting *Church v. State*, 164 Ill. 2d 153, 162 (1995)). But, reviewing courts are not bound by agency interpretation that conflicts with the statute or is unreasonable or otherwise erroneous. *Id*.

¶ 47                    The Act and the Commission's Interpretation

¶ 48    The Act defines a "claim of torture" as "a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into *confessing to a crime* for which the person was convicted and the tortured *confession* was used to obtain the conviction and for which there is some credible evidence related to the allegations of torture." (Emphasis added.) 775 ILCS 40/5(1) (West 2020). As a result of the rule-making authority granted by the General Assembly

(*Hadley*, 224 Ill. 2d at 370), the Commission implemented its own definition of "torture" and "tortured confession."

¶ 49    The Commission defined "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for the purpose of obtaining from that person a confession to a crime." 20 Ill. Adm. Code. § 2000.10. It defined "tortured confession" as "any incriminating statement, vocalization or gesture alleged by police or prosecutors to have been made by a convicted person that the convicted person alleges [was] a result of (or, if the convicted person denies making the statements, occurred shortly after) [an] interrogation that the convicted person claims included torture." 20 Ill. Adm. Code. § 2000.10. The Commission's definition of "tortured confession" goes beyond a confession as Illinois reviewing courts have historically understood the term and expressly encompasses a statement short of a confession.

¶ 50    We defer to an agency's interpretation when the statute is ambiguous. *Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 239 (1996). Commonly, a "confession" is "a statement of guilt or obligation in a matter pertaining to oneself." Webster's Third New International Dictionary 475 (2000). See *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009) (courts may consult dictionaries for plain and ordinary meaning of undefined words or phrases)

¶ 51    As Milan points out, our courts have defined "confession" repeatedly over the past 100 years. *People v. Nitti*, 312 Ill. 73, 92 (1924) ("a direct acknowledgment of guilt on the part of the accused, either by a statement of the details of the crime or an admission of the ultimate fact."); *People v. Manske*, 399 Ill. 176, 184-85 (1948) ("A confession is an acknowledgement of guilt, and not of any particular fact connected with the case."); *People v. Stapleton*, 300 Ill. 471, 476 (1921) ("a voluntary declaration by a person charged with crime of his agency or

participation in the crime, and not merely a declaration or admission of facts criminating in their nature or tending to show guilt."); *People v. Rollins*, 119 Ill. App. 2d 116, 131 (1970) ("a comprehensive admission of guilt or of facts which necessarily and directly imply guilt."); *People v. Georgev*, 38 Ill. 2d 165, 175 (1967) (confession must acknowledge all elements of crime and is confession of guilt).

¶ 52    Nevertheless, we must consider the context in which "confession" is used in the Act. Muhammad and the Commission argue that the law has "evolved" and "confession," as used in "tortured confession," encompasses all incriminating statements. In support, they cite section 5/114-11 of the Code of Criminal Procedure, which has been recognized as the proper pretrial mechanism for challenging the admissibility of all statements by a defendant, regardless of whether they correspond to a "confession." 725 ILCS 5/114-11 (West 2020). Section 5/114-11 provides that "[p]rior to the trial of any criminal case a defendant may move to suppress as evidence any *confession* given by him on the ground that it was not voluntary," and employs "confession" repeatedly in the statute. *Id*. (emphasis added.).

¶ 53    Our supreme court has held that under section 114-11, "the word 'confession' must be read to include both inculpatory and exculpatory statements," thereby embracing the then-new constitutional standards in *Miranda v. Arizona*, 384 U.S. 436 (1966). *People v. Costa*, 38 Ill. 2d 178, 182-83 (1967).

¶ 54    Due to these multiple interpretations of "confession," Muhammad contends that its meaning is at least ambiguous.

¶ 55    Milan acknowledges *Costa* expanded the definition of "confession" under section 114-11 but suggests that no constitutional mandate exists to construe the Act beyond its plain and

unambiguous language. Milan points to *People v. Georgev*, 38 Ill. 2d 165 (1967) and *People v. Lefler*, 38 Ill. 2d 216 (1967) , which were decided on the same day as *Costa*.

¶ 56    In *Georgev*, the defendant claimed his statements should not have been admitted into evidence because the State failed to provide him the writing of the oral statements he made and, whether his oral statements were reduced to a writing or not, the State had to give him the names and addresses of persons present when he made the statements. *Georgev*, 38 Ill. 2d at 174 (citing Ill.Rev.Stat.1963, chap. 38, par. 729) As to the meaning of "confession" under Paragraph 729 of the Criminal Code (Ill.Rev.Stat.1963, chap. 38, par. 729 since repealed), the court explained,

"Confessions must be distinguished from admissions against interest. Jones on Evidence, 5th Ed., sec. 398 states: '* * * As the terminology is used in criminal law, a 'confession' must be distinguished from an 'admission' of lesser import * * *. A confession out of court or an extrajudicial confession is comprehensive in its scope, * * * in that it acknowledges all of the elements of the crime and, therefore, is a confession of guilt * * *. A verbal (that is, expressed in words, oral or written) admission in criminal law, as generally understood, is different from a confession in that it is not an acknowledgment of guilt but is a statement having evidentiary value in proof of an element of the offense charged." *Id.* at 175.

¶ 57    The court found that the "statements of the defendant here were admissions against interest and not confessions" and, given the spontaneity of the statement and circumstances under which the statement was made, "there [was] nothing to suggest that the admission by the defendant was not a spontaneous and voluntary one and nothing to suggest that [the sheriff] devised any stratagem to induce it." *Id.* at 176. So, the trial court did not err. *Id.*

¶ 58    In *Lefler*, the defendant father's infant daughter died with a skull fracture, extensive brain

injury, and rib injuries. *Lefler*, 38 Ill. 2d at 218. The defendant admitted to shaking and squeezing his daughter to get her to stop crying, and he could have broken her ribs in the process. Defendant was convicted of involuntary manslaughter. *Id*. at 222. The main issue on appeal was whether the defendant's statements that he "squeezed her" and "wanted her to stop crying" amounted to admissions for which the voluntariness needed to be determined. *Id*. at 220-21. Our supreme court acknowledged that "the statements of the defendant were not in the strict sense of the word confessions to the crime of murder, [but] it is apparent that they were not entirely exculpatory and that his admissions that he squeezed the child to keep her from crying were incriminating." The court found consistent with its holding in *People v. Hiller*, 7 Ill. 2d 313 (1955), the "voluntary character of any out-of-court statement must first be established before the statement may be used, even for impeachment purposes."

¶ 59      The court further found that "[o]ur adoption of this rule finds support in the decision of the U.S. Supreme Court in *Miranda v. State of Arizona*" and "that the rule enunciated in these recent decisions of our court and the U.S. Supreme Court, is the proper one and we adhere to it in this case." The court reversed and remanded for a new trial because the trial court erred by not holding a preliminary hearing to determine the voluntariness of the defendant's admissions. *Id*. at 221. The court noted that, as stated in "*Georgev*, the distinction between confessions and admissions is preserved by section 114-10 of the Code of Criminal Procedure in connection with the furnishing of a list of witnesses to oral statements." (Citations omitted.) *Id*.

¶ 60      Milan urges that *Costa*, *Georgv,* and *Lefler* read together stand for the proposition that a "confession" is an acknowledgment of guilt and applies to all instances other than the limited circumstances of permitting a pretrial hearing on a motion to suppress a confession under

section 5/114-11. 725 ILCS 5/114-11 (West 2020). Milan contends that since *Costa*, *Georgv*, and *Lefler,* our supreme court has used this definition of "confession" when addressing jury instruction issues. See *People v. Floyd*, 103 Ill. 2d 541, 548-49 (1984) (giving jury instruction on confession error when defendant's statement, while incriminating, not inconsistent with his contention that victim's death was accidental and not "confession"); *People v. Horton*, 65 Ill. 2d 413, 418 (1976) (error "to instruct a jury that defendant has confessed to a crime when he has made only an admission").

¶ 61    Three flaws thwart Milan's argument. First, in this case, the phrase is "tortured confession," not "confession." Milan's plucking of "confession" from the phrase "tortured confession" divorces it from the context in which the Act uses the term. Second, although the terms "confession" and "admission" had different definitions in the context of jury instructions in the first edition of the pattern jury instructions (Illinois Pattern Jury Instructions, IPI Criminal, Nos. 3.07 and 3.06 (1st ed. 1961)), that is no longer true. In the past, the two separate jury instructions required the parties to litigate whether a statement was a "strict confession of guilt or merely an admission of an incriminating fact." *People v. James*, 2017 IL App (1st) 143391, ¶ 125. Regardless, the second edition of the pattern jury instructions, IPI Criminal Nos. 3.06 and 3.07 were consolidated into one instruction and employed the general term "statement" in place of the more specific terms "confession" and "admission." Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (2d ed. 1981). These changes "avoided the complications that ensue when a judge characterizes a statement," eliminating this unnecessary risk of prejudice to the defendant. IPI Criminal 2d No. 3.06-3.07, Committee Note; *James*, 2017 IL App (1st) 143391, ¶ 126. This court has held that the current version of IPI Criminal 4th No. 3.06-3.07, which also

uses "statement" applies "to a defendant's self-incriminating statements-confessions, admissions, or false exculpatory statements-relating to the charged offense(s)." *James*, IL App (1st) 143391, ¶ 133.

¶ 62        Third, and most significantly, we are tasked with considering Muhammad's torture claim through the lens of whether the outcome of the suppression hearing would likely have been different given the new pattern and practice evidence. *People v. Anderson*, 2023 IL App (1st) 200462, ¶ 154. As Milan acknowledges, a "confession" is an acknowledgment of guilt and applies to all instances other than the limited circumstances of permitting a pretrial hearing on a motion to suppress a confession under section 5/114-11. 725 ILCS 5/114-11 (West 2020). As the Act requires us to consider whether the result of a suppression hearing would have been different, it necessarily follows that this is also a limited circumstance where the definition of "confession" as an acknowledgment of guilt would be inapplicable.

¶ 63        This court has allowed the circuit court to simultaneously consider a petitioner's claim under the Act and request to suppress his or her statement under section 5/114-11. *Wilson*, 2019 IL App (1st) 181486, ¶ 151; *Gibson*, 2018 IL App (1st) 162177, ¶ 139 (trial court's inquiry at suppression hearing significantly overlaps with inquiry at evidentiary hearing on police torture). Thus, the circuit court can consider whether Muhammad's statement to Detective Fidyk should be suppressed at an evidentiary hearing on his torture claim. Given that possibility, the Act cannot be limited to a confession as an acknowledgment of guilt.

¶ 64        Our analysis of when "confession" means "confession" and when it means something more leads us to conclude that "confession" is ambiguous because reasonably well-informed persons reading the Act could understand "confession" in more than one sense. *People v. Jameson*, 162

Ill. 2d 282, 288 (1994) (statute ambiguous if reasonably well-informed persons can understand it in two or more ways). Despite that, we do not impose our own construction on the statute as would be necessary without an administrative interpretation. *Chevron, U.S.A., Inc v. Natural Resources Defense Council, Inc*, 467 U.S. 837, 843 (1984). Instead, we must determine whether the agency's interpretation relies on a permissible construction of the statute. "A court will not substitute its own construction of a statutory provision for a reasonable interpretation adopted by the agency charged with the statute's administration." *Church,* 164 Ill. 2d at 162 (citing *Chevron*, 467 U.S. at 842-45).

¶ 65    We are not bound by the Commission's interpretation of "tortured confession" irrespective of its reasonableness. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98 (1992). Yet, if the Commission's interpretation is permissible, that we might have interpreted the statute differently does not justify reversal. *Church*, 164 Ill. 2d at 162; *Chevron*, 467 U.S. at 843-44. We find the Commission's interpretation of "tortured confession" as reasonable based on both our discussion of recent Illinois court interpretations of "confession" and the legislature's intent as explained by the Act's stated purpose: "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture." 775 ILCS 40/10 (West 2020). Any suggestion that certain kinds of statements are not within the province of the Commission's investigatory authority is notably absent from this express purpose. Moreover, we recognize that a torturer not only seeks to obtain confessions but statements that can be used against a suspect. Based on the Act's stated purpose, it would be nonsensical for the Commission to consider only a tortured confession that acknowledges guilt and nothing less. Our interpretation respects the Act's purpose and spirit.

¶ 66      Further support comes from legislation that made it a felony to "compel a confession or information by force or threat." 720 ILCS 5/12-7 (West 2020). Adopted well before the Commission was established, this offense forbids a person with the intent to "obtain a confession, statement or information regarding any offense" to knowingly threaten or inflict "bodily harm upon the person threatened or upon any other person." 720 ILCS 5/12-7 (West 2020). Although separate from the Act, when considered in conjunction with the Act, this statutory offense shows an overall movement to rectify convictions based on prior statements made on account of torture and prevent future statements from being obtained as a result of force or threat of force. It would be odd that a police officer can be prosecuted for obtaining "information" by force from a suspect, but a convict could not obtain relief under the Act for a statement obtained by torture. We see no definitive indication that the legislature intended to distinguish between "confessions" obtained by torture, which acknowledge guilt, and other statements containing admissions or incriminating information.

¶ 67      Accordingly, we find that Muhammad's statement to Detective Fidyk qualifies as a "tortured confession" under the Commission's interpretation of the Act. We reverse and remand for the circuit court to conduct an evidentiary hearing to determine the merits of Muhammad's claim that he was tortured into giving the statement. We make no findings on the issue.

¶ 68      Muhammad's Claimed *Brady* Violation

¶ 69      Muhammad next argues that the circuit court erred by failing to consider the Commission's finding of a possible *Brady* violation under which the State must disclose to the defense all evidence favorable to defendant and material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963). Milan argues that a potential *Brady* violation is irrelevant to Muhammad's

claim of torture under the Act. The Commission found otherwise. We address this issue because it is likely to recur on remand.

¶ 70    As discussed, the circuit court terminated the proceedings after determining that Muhammad's statement to Detective Fidyk was not a "confession," as the Act uses that term. Concerning the *Brady* violation, the circuit court found,

> "In essence, the Commission is making an alleged *Brady* violation part of the claim of torture to shore up the credibility of a person the Commission had grave reservations regarding his claim of coercion made approximately 14 years after he was convicted. Incorporating the *Brady* claim into the claim of torture--into the claim of the torture analysis would require an evidentiary hearing on the part of the referral without the appropriate opportunity for separate consideration as would be appropriate under the Post-Conviction Act or post-judgment proceeding under 2-1401."

So, the court heard no evidence regarding Muhammad's claim of torture or the potential *Brady* violation.

¶ 71    The Commission, in determining whether sufficient evidence of torture exists to refer a claim for judicial review, may "use any measure provided in the Code of Civil Procedure and the Code of Criminal Procedure of 1963 to obtain information necessary to its inquiry." 775 ILCS 40/40(d) (West 2020). And the Commission may "issue subpoenas or other process to compel the attendance of witnesses and the production of evidence, administer oaths, petition the Circuit Court of Cook County or of the original jurisdiction for enforcement of process or for other relief." 775 ILCS 40/40(d) (West 2020). If, as the result of the Commission's investigation, it discovers "[e]vidence of criminal acts, professional misconduct, or other

wrongdoing disclosed through formal inquiry or Commission proceedings," that information "shall be referred to the appropriate authority" as well as to the convicted person or his counsel if the evidence is favorable. 775 ILCS 40/45(d) (2020).

¶ 72        Again, the Act establishes "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture." 775 ILCS 40/10 (West 2020). To reiterate, a "claim of torture" is defined as an assertion that a person "was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence related to allegations of torture." 775 ILCS 40/5(1) (West 2020).

¶ 73        In line with the Act's purpose, when evaluating a Commission referral, the circuit court asks whether the outcome of the original suppression hearing would likely have been different if the officers who denied torturing the defendant had been subject to impeachment based on newly discovered evidence that those officers engaged in a pattern of abusive tactics in other cases. *Smith*, 2022 IL (1st) 201256-U, ¶ ¶92, 95-96. In creating the Act, "the legislature clearly did not create a new form of postconviction relief." *Wilson*, 2019 IL App (1st) 181486, ¶ 52. Ultimately, the trial court determines the merits of a torture claim.

¶ 74        The "possible" *Brady* violation the Commission uncovered related to the State's failure to disclose that Muhammad participated in several lineups in which multiple witnesses did not identify him. We find this issue relevant to Muhammad's claim of torture. As the Commission and circuit court observed, Muhammad did not bring his claim of torture until 14 years after Detective Fidyk interrogated him. In his motion to terminate the proceedings before the circuit court, Milan argued Muhammad's delay made it less credible; thus, we can safely assume that

the State will make the same argument. But, Muhammad claims that he repeatedly told his attorney before trial that the police coerced the statement from him, yet his attorney did not raise the issue with the trial court. The Commission determined this was plausible, stating "[t]hat valid lineup issues were not discovered and litigated by Muhammad's attorney before trial makes it at least possible that Muhammad informed [his] attorney about any coercive interrogation tactics that were also not explored by trial." Thus, the Commission concluded that there was enough evidence to merit the referral of Muhammad's torture claim for an evidentiary hearing.

¶ 75   We cannot say that the Commission's finding is against the manifest weight of the evidence. See *Johnson*, 2022 IL App (1st) 201371, ¶ 76 (on receipt of referral, circuit court should proceed to evidentiary hearing unless court finds Commission's "threshold determination was itself against the manifest weight of the evidence"). Indeed, the Commission's factual findings do not bind the circuit court in determining the merits of a torture claim.

¶ 76   This court has held that proceedings under the Act and the Post-Conviction Hearing Act are intended to work together, not against each other. *Gibson*, 2018 IL App (1st) 162177, ¶ 137. A permissible and prudent pleading procedure would be to file a joint petition under both the Commission referral and the post-conviction statute for a combined evidentiary hearing, as the Commission referral is a type of "postconviction hearing" within the meaning of Illinois Rule of Evidence 1101(b)(3).

¶ 77   Because the alleged *Brady* violation is closely tethered to the merits of Muhammad's torture claim, we reject Milan's contention that the potential *Brady* violation is irrelevant to Muhammad's torture claim and could not be raised under the Act.

¶ 78                                    Conflict Issues

¶ 79        The law is explicit: To ensure a prosecutor's impartial judgment, a prosecutor with an actual

conflict of interest must be removed. The conflict, without more, creates the perception that

bias, favoritism, or personal interests may influence the prosecutor, thereby compromising the

integrity and fairness of the proceedings.

¶ 80        Milan contends no actual conflict of interest bars his review of Muhammad's case, ignoring

that as Supervisor of the Felony Review Unit in the Cook County's State's Attorney's Office,

*he initiated* the criminal prosecution of Muhammad years ago. Milan also ignores that at his

appointment in this case, he stood mute, failing to disclose his relationship with Detective

McDermott and violating due process and the rules of professional conduct. His actual conflict

calls for the appointment of a new special prosecutor.

¶ 81        Where, as here, no factual dispute exists, we review *de novo* the legal issue of whether an

attorney operates under a conflict of interest. *People v. Peterson*, 2017 IL 120331, ¶ 101

(reviewing conflict of interest *de novo* where relevant facts not disputed).

¶ 82                                Actual Conflict of Interest

¶ 83        Muhammad contends Milan has a personal interest because he was "the direct supervisor

for the felony review unit and the felony trial attorneys at the time Muhammad was tortured and

tried." Muhammad contends Milan's personal involvement undermines the proceedings "in

ways known, unknown, and perhaps even unknowable," "cast[ing] doubt on the procedures in

place to ensure due process under the law."

¶ 84        Milan replies that Muhammad invited this error by asking for Milan's appointment. The

record shows Muhammad moved to appoint Milan, who had already served as the special

prosecutor in other cases at the time the SAO determined it could not participate.

¶ 85        Generally, parties cannot complain of errors they induced the court to make and to which they consented. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). But that general rule does not apply when an "interested party" acts as a prosecutor given that the resulting error is "fundamental and pervasive," raising doubts that "undermine confidence in the integrity of the criminal proceeding" and " 'call[ing] into question the objectivity of those charged with bringing a defendant to judgment.' " *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 809-10 (1987) ((plurality opinion), quoting *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986)). Because this error casts doubt on the integrity of the process, we have a duty to act. *Hux v. Raben*, 38 Ill. 2d 223, 225 (1967) (noting "the responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversary character of our system"); see *People v. Lang*, 346 Ill. App. 3d 677, 682 (2004) (even in absence of prejudice to defendant, special prosecutor may be necessary to remove appearance of unfair prosecution under plain error principles protecting integrity of proceedings).

¶ 86        Milan next contends the circuit court appointed him as special prosecutor and, as a result, could only remove him for an "actual conflict of interest," which he claims he does not have. Milan adds that an appearance of impropriety alone would not justify removal under the statute.

¶ 87        Section 5/3-9008(a-10) governs the appointment of a special prosecutor and outlines the procedures:

   "The court on its own motion, or an interested person in a cause or proceeding, civil or

criminal, may file a petition alleging that the State's Attorney has an actual conflict of interest in the cause or proceeding. The court shall consider the petition, any documents filed in response, and if necessary, grant a hearing to determine whether the State's Attorney has an actual conflict of interest in the cause or proceeding. If the court finds that the petitioner has proven by sufficient facts and evidence that the State's Attorney has an actual conflict of interest in a specific case, the court may appoint some competent attorney to prosecute or defend the cause or proceeding." 55 ILCS 5/3-9008(a-10) (West 2020).

¶ 88    Before this statute's amendment in 2016, courts held the mere appearance of impropriety warranted the removal of a prosecutor. See, e.g., *People v. VanderArk*, 2015 IL App (2d) 130790, ¶ 38 (citing pre-amended version). But the amendment added the language "actual conflict of interest." 55 ILCS 5/3-9008(a-10) (West 2020). Thus, one court has held that the party seeking a special prosecutor must demonstrate an actual conflict of interest, not just the appearance of impropriety. *In re Appointment of Special Prosecutor*, 2019 IL App (1st) 173173, ¶ 33-39. Another court has held that the appearance of impropriety remains enough under the statute's current version to warrant removal. See *People v. Benford*, 2022 IL App (2d) 200349-U, ¶ 39 (citing 2018 version of section 5/3-9008 and finding appearance of impropriety as form of actual conflict of interest). We need not enter this debate: Milan has an actual conflict of interest.

¶ 89    Before explaining why, we note that the statute does not define "actual conflict of interest." Absent a statutory definition, this court has found that a State's Attorney has "an actual conflict of interest" if he or she "is interested in" the case as either (i) a private individual, or (ii) an actual party to the action. *In re Appointment of a Special State's Attorney on Behalf of Hanley*,

2020 IL App (2d) 190845, ¶ 17. This statute "prevent[s] any influence upon the discharge of the duties of the State's Attorney by reason of personal interest." *McCall v. Devine*, 334 Ill. App. 3d 192, 199 (2002).

¶ 90    The defendant must have more than speculation or suspicion. *McCall*, 334 Ill. App. 3d at 205 (motion to appoint special prosecutor denied where no pleaded facts showed improbability state's attorney would conduct biased investigation and prosecution). Consistent with this decision, we have found an actual conflict of interest where a newly appointed state's attorney acted as defense counsel for the defendant. *People v. Courtney*, 288 Ill. App. 3d 1025, 1034 (1997).

¶ 91    We have found no Illinois decision where a party sought to remove a special prosecutor for an actual conflict of interest. But the parties do not dispute that section 5/3-9008 controls. And we agree. Section 5/3-9008, as our courts interpret it, applies to removing a special prosecutor. See *In re Appointment of Special State's Attorney*, 305 Ill. App. 3d 749, 758 (1999) (section 5/3-9008 also states grounds for disqualifying special state's attorney under pre-amended version). Indeed, as we will show, deciding this issue takes no novel insight. Instead, we employ "a longstanding interpretive principle: When a statutory term is ' 'obviously transplanted from another legal source,' ' it ' 'brings the old soil with it.' ' " *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting, *Hall v. Hall*, 584 U.S. ——, ——, 138 S.Ct. 1118, 1128 (2018), quoting Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).

¶ 92    Finding an "actual conflict of interest" requires us sifting caselaw to clarify the role of the prosecutor. "Prosecutors 'have available a terrible array of coercive methods to obtain information,' such as 'police investigation and interrogation, warrants, informers and agents

whose activities are immunized, authorized wiretapping, civil investigatory demands, [and] enhanced subpoena power.' " *Young*, 481 U.S. at 811 (quoting, C. Wolfram, Modern Legal Ethics 460 (1986)). Milan, when with the SAO, was one of its most senior members with these powers.

¶ 93       Of critical significance is United States Supreme Court's and the Illinois Supreme Court's shared understanding of the prosecutor's role. "No attorney is more integral to the accusatory process than a prosecutor who participates in a major adversary decision." *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016). And of the many decisions a prosecutor makes, the first among equals is the prosecutorial choice to bring charges. "It is the functional comparability of [prosecutor's] judgments to those of the judge that has resulted in * * * prosecutors being referred to as quasi-judicial officers[.]" (Internal quotation omitted.) *Imbler v. Pachtman*, 424 U.S. 409, 423 n. 20 (1976); see *People ex rel. Schreiner v. Courtney*, 380 Ill. 171, 179 (1942) (describing prosecutor as "quasi-judicial officer"). Accordingly, "[i]t is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

¶ 94       The undisputed facts show Milan exercised a quasi-judicial power as supervisor of the Felony Review Unit in the Cook County's State's Attorney's Office that charged Muhammad with first-degree murder. The nature of these proceedings shows Milan seeking to exercise that power again, holding over Muhammad the powers to dismiss the case, re-prosecute him, and terminate the proceedings. See 775 ILCS 40/50 (a),(b) (successful petitions may lead to "re-arraignment, retrial, custody, pretrial release, or discharge" and directing state's attorney or

designee to represent state). The exercise of these powers dictates that Milan judge the validity of his original decision to prosecute. Thus, Milan possesses the improper ability to "judge" himself and his subordinates.

¶ 95    "The due process guarantee that 'no man can be a judge in his own case' would have little substance if it did not disqualify a former prosecutor from sitting in judgment of a prosecution in which he or she had made a critical decision." *Williams*, 579 U.S. at 9. In *Williams*, due process barred a sitting justice from ruling on a collateral appeal by the same defendant when decades earlier, as a prosecutor, the judge had authorized seeking of the death penalty. *Id.* at 11. "The involvement of multiple actors and the passage of time [did] not relieve the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process in determining the consequences that his or her own earlier, critical decision may have set in motion." *Id.*

¶ 96    Similarly, First Assistant State's Attorney Milan's exercise of the quasi-judicial power in Muhammad's underlying case precludes him from exercising, or seeking to exercise, the power of a special prosecutor. Due process does not tolerate the "risk of actual bias" that Milan presents. *Id.* at 8. Failing to replace Milan as special prosecutor would undermine the integrity of the court.

¶ 97    In reaching this conclusion, we reject as baseless the dissent's claim that Muhammad "[a]t no point" argued Milan's appointment violated his due process rights. *Infra* ¶ 133. The due process clause forms the cornerstone of his challenge, as Muhammad contended Milan's personal involvement in the prosecution undermined the integrity of these proceedings "in ways known, unknown, and perhaps even unknowable" and thus "cast[ed] doubt on the procedures

in place to ensure due process under the law." See *Williams*, 579 U.S. at 13 (noting, statutes and professional codes of conduct provide more protection than due process requires). Illinois law on conflicts of interest marks the ethical ceiling; the due process clause sets the legal floor.

¶ 98    Decades of torture by Chicago police took place before the courts and legislature acted. See Kim D. Chanbonpin, *Truth Stories: Credibility Determinations at the Illinois Torture Inquiry and Relief Commission*, 45 Loy. U. Chi. L. J. 1085, 1091-106 (2014) (canvassing this history and concluding "the crisis of police torture is more far-reaching than the 'bad apples' myth suggests"). That formal recognition culminated with the enactment of the Illinois Torture Inquiry and Relief Commission Act. 775 ILCS 40/1 (eff. Aug. 10, 2009); see State of Illinois Torture Inquiry and Relief Commission, https://www2.illinois.gov/sites/tirc/Pages/default.aspx; *Leach v. Dep't of Emp. Sec.*, 2020 IL App (1st) 190299, ¶ 44 ("[i]nformation on websites and in public records are sufficiently reliable such that judicial notice may be taken" and collecting examples).

¶ 99    The Act created "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture[.]" 775 ILCS 40/10 (West 2010).

¶ 100    But Milan seeks to halt any inquiry, as the head of the office directing the response to Muhammad's allegations, even though all the reasons the SAO withdrew apply in every respect to Milan. The dissent would let Milan remain, even though the undisputed facts show that Milan directly supervised the felony review unit and felony trial attorneys when the State arrested, interrogated, charged, and tried Muhammad. *Infra* ¶ 175. By fiat, the dissent asserts Milan's direct participation in Muhammad's prior prosecution constitutes neither "actual facts" nor "actual evidence." *Infra* ¶ 150. The dissent appears to require that Milan have personally

secreted the key to the interrogation room in which Muhammad alleges he remained for four days straight, thus forcing him to urinate and defecate on the floor. At the same time, the dissent acknowledges that prosecutors generally "are not disinterested parties to criminal prosecutions." *Infra* ¶ 162.

¶ 101     The central conflict within the dissent, recognizing the significance of Muhammad's claims but downplaying the significance of Milan's involvement, cannot hold. Nor should it. As Muhammad rightly insists, when an "interested party" acts as a prosecutor, the resulting error is "fundamental and pervasive." (quoting *Young*, 481 U.S. at 809-10 (plurality opinion)). The undisputed facts of Milan's prior involvement trigger this court's duty to remove him. *Hux*, 38 Ill. 2d at 225; see *Lang*, 346 Ill. App. 3d at 682. No court should ever tolerate the "risk of actual bias" that Milan's personal participation now threatens, or else the scales of justice tip perilously, breeding resentment and distrust in the criminal system as a whole. See *Williams*, 579 U.S. at 8.

¶ 102     The dissent's insistence that Muhammad offer something more as proof than undisputed evidence underscores the absurdity of Milan's participation. The dissent insists that Milan was no judge in his own case. *Infra* ¶¶ 161-163. But it is no answer to the charge that Milan acts as a judge in his own case to say he may proceed as he wishes, acting both as advocate and witness. See *People v. Blue*, 189 Ill. 2d 99, 136 (2000) (describing "advocate-witness rule," which bars attorneys from playing dual roles as advocate and witness in same proceeding). Milan's dual participation is inconsistent with the search for truth and guts the reliability of the circuit court's "ultimate decision," as the dissent describes it (*Infra* ¶ 165).

¶ 103     Finally, Milan argues that in 2017, before accepting his appointment, he obtained an ethics

opinion from a former senior counsel to the Administrator at the Illinois Attorney Registration and Disciplinary Commission. According to the opinion that he personally sought from a private attorney, Milan did not have a conflict of interest in serving as special prosecutor "in the Burge cases" even though "some of the cases may have been in the State's Attorney's system while you [Milan] were First Assistant or Chief Deputy."

¶ 104    But this case cannot be classified as a "Burge case" since Burge was suspended in 1991 and terminated in 1993, years before Muhammad's case arose. Rather, this case involves allegations against Detective McDermott, who, after he retired from the police department, became an investigator for the SAO. Many TIRC decisions, including this one, concern alleged torture by McDermott. https://tirc.aem-int.illinois.gov/search.html?q=mcDermott&contentType=everything; see *Leach*, 2020 IL App (1st) 190299, ¶ 44 (noting "[i]nformation on websites and in public records are sufficiently reliable such that judicial notice may be taken" and collecting examples).

¶ 105    Indeed, the opinion focuses on Rule 1.11(a) of the Illinois Rules of Professional Conduct. That rule addresses "successive government and private employment," which is not at all relevant here. When Milan became special prosecutor, he represented the same governmental client he did before, not a different client as contemplated by Rule 1.11(a).

¶ 106    Tellingly, the conflict Muhammad alleges does not fit squarely within the type of conflicts recognized in the rules. But, the concepts expressed in Rule 1.7(a)(2) support rescinding Milan's appointment, as Muhammad's expert witness explained in an affidavit to the circuit court.

¶ 107    Rule 1.7 prohibits a lawyer from representing a client in a matter that "involves a concurrent conflict of interest." Ill. R. Prof'l Conduct R. 1.7(a) (eff. Jan. 1, 2010). Subparagraph (a)(2),

states that concurrent conflict exists where "there is a significant risk that the representation of one or more clients will be materially limited *** by a personal interest of the lawyer." Ill. R. Prof'l Conduct R. 1.7(a)(2) (eff. Jan. 1, 2010). Disqualification under the "material limitation conflict" provision of Rule 1.7(a)(2) requires a showing that "there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." Ill. R. Prof'l Conduct 1.7(a)(2) cmt. 8 (eff. Jan. 1, 2010). Moreover, "[t]he lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice." Ill. R. Prof'l Conduct 1.7(a)(2) cmt. 10 (eff. Jan. 1, 2010).

¶ 108      Milan's representation of the State as a special prosecutor is materially limited by his personal interests. Milan supervised felony review attorneys and trial attorneys when Muhammad was arrested, interrogated, charged, and tried. He was involved in interrogating felony suspects at that time and received at least one detailed report about the apparent police torture of a detained suspect in the felony review process. The Commission found sufficient factual support for Muhammad's claims that he was tortured in police custody during the felony review process to warrant judicial examination. The Commission also found evidence that the police and SAO committed significant Brady violations—multiple witnesses at lineups were unable to identify Muhammad, and these were covered up and never disclosed.

¶ 109      Regardless of whether Milan was personally involved in interrogating suspects or knew that police officers obtained tortured confessions, he has a personal interest that constitutes a

conflict. Milan spent nearly 20 years at the SAO, eventually becoming First Assistant. Allegations of misconduct by SAO, particularly during his tenure as First Assistant, pose risks to SAO and Milan's reputation. Bruce A. Green & Rebecca Roiphe, *Rethinking Prosecutors' Conflicts of Interest*, 58 B.C. L. Rev. 463, 481 (2017) (prosecutors' personal interest in their public image undermines their ability to view evidence objectively and dropping charges may be viewed as public concession that prosecutor previously made mistake).

¶ 110    Moreover, under the Rules of Professional Conduct, Milan had an ethical duty to supervise the attorneys under his watch. See Ill. R. Prof'l Conduct Rule 5.1(b) (eff. Jan. 1, 2010) ("lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer's conduct conforms to these Rules"). Milan is subject to discipline for failing to make reasonable efforts to ensure those attorneys act ethically. Milan had a personal interest in avoiding an evidentiary hearing at which the evidence might have exposed that he violated rules of professional conduct.

¶ 111    Muhammad has the burden of proving the misconduct he alleges that the police as well as the SAO attorneys engaged in under Milan's supervision, which could include violations of Illinois Rule of Professional Conduct 4.1(a) (eff. Jan. 1, 2010) (false statements to third person; presenting recreated lineup photos at trial, and falsely pretending to be public defender during Muhammad's interrogation); Rule 4.4(a) (eff. Jan. 1, 2010) (using "methods of obtaining evidence that violate the legal rights of *** a person"); Rule 8.4 (eff. Jan. 1, 2010) (engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation" or that is "prejudicial to the administration of justice"). Illinois ethical rules and general principles of due process and conflicts of interest mandate that a special prosecutor is not involved in the proceeding that will

adjudicate claims in which he or she has a personal interest and disclose the facts and circumstances surrounding an actual or potential conflict of interest as soon as he or she becomes aware of it to the court and affected defendant(s). Ill. R. Prof'l Conduct R. 1.7(a) (eff. Jan. 1, 2010); *Williams*, 579 U.S. at 8; *Young*, 481 U.S. at 809-10 (plurality opinion); *Blue*, 189 Ill. 2d at 136; *Hux*, 38 Ill. 2d at 225.

¶ 112    Despite knowing of accusations concerning McDermott and McDermott's presence in this case as an alleged torturer, Milan not only continued working the case but, according to the record, resisted Muhammad's counsel's attempt to elicit the facts underlying Milan's association with McDermott.

¶ 113    We agree with Muhammad that Milan labored under an actual conflict of interest. Milan's removal as special prosecutor fosters public confidence in the impartiality and integrity of our criminal judicial system. Thus, we need not address Muhammad's alternative theories.

¶ 114                            The Dissent's Missteps

¶ 115    The dissent's core contention is that "no actual facts [tie] Milan to Muhammad's torture or subsequent prosecution." *Infra* ¶ 150. For example, the dissent writes, "[N]othing in the record *** support[s] the majority's assertion that Milan had a 'relationship' with McDermott ([*supra*] ¶ 80) or that McDermott's position with the CCSAO aligned with or overlapped Milan's work-related responsibilities ([*supra*] ¶ 100)." *Infra* ¶ 149. So, in the dissent's view, it's not relevant that Milan had supervisory authority over everyone in the office. Thus, by fiat, the dissent excuses Milan's admitted participation in Muhammad's prosecution as supervisor. *Infra* ¶ 149 (demanding proof "McDermott's position with the CCSAO aligned with or overlapped Milan's work-related responsibilities"). The dissent apparently insists on more evidence, something like

a jointly signed performance review by Milan of McDermott.

¶ 116    Drawing lines (here, around Milan) is a common, though mistaken, move in legal reasoning. Yet the dissent goes further and mischaracterizes our opinion, the briefing before this court, and the applicable law. So, we take this moment to correct course.

¶ 117    The dissent's multiple missteps begin with the standard of review. Like Muhammad's briefing, we formulate the key question before this court as one of law, and thus *de novo* review applies. See *Supra* ¶ 81 (citing *Peterson*, 2017 IL 120331, ¶ 101). The dissent disagrees, asserting that abuse of discretion standard applies. *Infra* ¶ 136.

¶ 118    But, like reviewing courts, circuit courts rule on legal questions from time to time. Even the abuse of discretion standard may require this court to determine " 'the legal adequacy of [the] way the [circuit] court reached its result.' " *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006) (quoting *People v. Ortega*, 209 Ill. 2d 354, 360 (2004)). And, of course, the circuit court must exercise its discretion within the bounds of the law. *People v. Williams*, 188 Ill. 2d 365, 369 (1999). When the circuit court fails to do so, this court may not sidestep a hard question of law by falsely invoking judicial modesty. *People v. Herrera*, 2023 IL App (1st) 231801, ¶ 24 ("legal error is actionable under even the most deferential standard of review").

¶ 119    The duty to determine hard questions of law dovetails with the duty to decide the questions before this court to reach a just result sensitive to the need for a sound and uniform body of precedent. See *Hux*, 38 Ill. 2d at 225 ("the responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversary character of our system").

¶ 120    The issue is whether Milan harbors an "actual conflict of interest" requiring his

disqualification under section 5/3-9008, given his admitted involvement in Muhammad's prosecution. Answering this question requires us to recognize that this term of art, "actual conflict of interest," has no statutory definition. *Supra* ¶ 89. Second, this question requires examining the full context in which this dispute arose—from an "extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture[.]" 775 ILCS 40/10 (West 2010). *Supra* ¶¶ 98-99.

¶ 121    The dissent distorts all this, faulting us for "manufactur[ing] a due process theory." *Infra* ¶ 130. A fair reading refutes that kind of specious reasoning. As Muhammad contends the professional rules of conduct are essential to the just resolution of this issue, which Muhammad's expert witness ably applied in an affidavit to the circuit court. And as critical is Muhammad's insight that Milan's involvement undermines the integrity of the proceedings "in ways known, unknown, and perhaps even unknowable," "cast[ing] doubt on the procedures in place to ensure due process under the law."

¶ 122    Our analysis, which draws together insights from Muhammad and his expert, does not transform the conflict of interest into anything other than what it is. We agree with the dissent that, "[u]nder the law[,] it *does* matter if Milan has a personal interest." (Emphasis in original.) *Infra* ¶ 167. But unlike the dissent, we find critical Milan's admitted involvement in Muhammad's prosecution and relation with McDermott, whose employment at the SAO figured in the SAO's conflict.

¶ 123    We do not share the dissent's farfetched concern that this opinion may require mass disqualifications. *Infra* ¶ 164. For the reasons we gave, section 5/3-9008 dictates disqualification of prosecutors alleged to have committed misconduct against petitioners, and

the rules of professional conduct and principles of due process also require nothing less.

¶ 124                                                    Conclusion

¶ 125        We reverse the circuit court's order terminating proceedings under the Act and the circuit court's orders denying Muhammad's motions to rescind Milan's appointment. We remand for the appointment of a special prosecutor and an evidentiary hearing on Muhammad's claim of torture referred to the circuit court by the TIRC.

¶ 126        We also direct the Clerk of the First Appellate Court to provide a copy of this opinion to the Illinois Attorney Registration & Disciplinary Commission.

¶ 127        Reversed and remanded with instructions.

¶ 128    JUSTICE TAILOR, concurring in part and dissenting in part:

¶ 129        I concur in the majority's decision that Judge Lawrence Flood erred in (a) rejecting the Commission's definition of a "tortured confession" under the Illinois Torture Inquiry and Relief Commission Act (Act), 775 ILCS 40/1, *et seq*. (West 2018); (b) concluding that Muhammad's statement was not a "tortured confession" under the Act; and (c) not providing Muhammad an evidentiary hearing on his claim that his statement was obtained through torture. However, I respectfully dissent from the majority's decision that then Presiding Judge LeRoy Martin, Jr., and his successor, Presiding Judge Erica Reddick erred in denying Muhammad's successive motions to rescind Robert Milan's appointment as special prosecutor in this case. This record does not show that Milan harbors a conflict of interest, actual or otherwise, and the circuit court did not abuse its discretion in rejecting Muhammad's successive bids to have Milan replaced.

¶ 130        The majority removes Milan as special prosecutor finding that his appointment violates Muhammad's due process rights. However, Muhammad did not advance a due process theory

below or on appeal. The majority manufactures a due process theory by quoting from the last page of Muhammad's opening brief where he states that Milan should be removed as special prosecutor because his personal involvement in the Cook County State's Attorney's Office (CCSAO) as a "direct supervisor in the felony review unit and the felony trial attorneys at the time Muhammad was tortured and tried" undermines the integrity of the proceedings "in ways known, unknown, and perhaps even unknowable", "cast[ing] doubt on the procedures in place to ensure due process under the law." Supra ¶¶ 83, 97. These quotations come from the section of Muhammad's brief arguing that Milan has a conflict of interest under Illinois Rule of Professional Conduct 5.1(b), which addresses the responsibility of a supervisor for the actions of his subordinate attorneys. There is no mention of due process in Muhammad's reply brief. Muhammad does not cite a single due process case in any of his briefs. The case he does cite, *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), was not a due process case, although Justice Blackman in a special concurrence said he would go further than the majority and also find a due process violation when an interested party's counsel is appointed to prosecute a criminal contempt arising out of a civil proceeding. Notably, no other justice joined Justice Blackman's concurrence. Yet, somehow the majority concludes from the two quotations found on the last page of Muhammad's brief that the "due process clause forms the *cornerstone* of [Muhammad's] challenge" to Milan's appointment as special prosecutor. Supra ¶ 97 (emphasis added.). Not so. As explained further below, the cornerstone, indeed the only stones, of Muhammad's argument to remove Milan is that he has an actual conflict of interest under section 5/3-9008(a-10) of the Counties Code (55 ILCS 5/3-9008(a-20) (West 2020)) and that his appointment violates the Rules of Professional Conduct.

¶ 131    Muhammad advanced numerous arguments below in support of his successive motions to have Milan removed as special prosecutor: (a) Milan's initial appointment as special prosecutor in 2017 violated section 5/3-9008 (a-20) because the court did not first seek out another public agency that would be willing to serve as special prosecutor before appointing Milan, a private practitioner; (b) the court did not enter a written order in this case appointing Milan as special prosecutor in violation of section 5/3-9008(c); (c) Milan harbored a *per se* conflict of interest because he worked at the Cook County State's Attorney's Office (CCSAO) under then State's Attorney Richard Devine, who was found to have an actual conflict of interest in the Jon Burge cases because he represented Burge when in private practice; (d) Milan had an actual conflict of interest because of his supervisory role in the CCSAO where he was in the position to charge Muhammad, trained and supervised the assistant state's attorneys who allegedly failed to disclose *Brady* material when he was supervisor of the Felony Review Unit of the CCSAO, and was First Assistant State's Attorney when Detective McDermott, Muhammad's alleged torturer, was hired by the CCSAO as an investigator; and (e) an appearance of impropriety existed because of Milan's previous employment with the CCSAO and because Milan may be called as a witness.

¶ 132    In his brief filed in this court, Muhammad argues, *inter alia*, that Milan has an actual conflict of interest and his appointment as special prosecutor should be rescinded under section 5/3-9008 of the Counties Code because: (a) he was the "Bureau Chief at the CCSAO at the very time Mr. Muhammad was being tortured and tried, which calls into question his impartiality;" (b) Milan's role at the CCSAO included supervising the felony review division and the felony criminal trial attorneys, "the very [assistant state's attorneys] that Mr. Muhammad claims helped

- 44 -

to frame him for the murder of Mr. Mims and whose misconduct the TIRC [Torture Inquiry and Relief Commission] specifically recommended for judicial examination;" and (c) Milan was "First Assistant at the CCSAO at the very time Mr. McDermott, a serial torturer and one of the detectives who tortured Mr. Muhammad, was hired by the CCSAO." Muhammad also argues that Milan has a conflict of interest under Illinois Rules of Professional Conduct 1.7(a)(2) and 5.1(b) for the same reasons. Finally, Muhammad argues that Milan should be removed from this case because Milan will be called as witness in this case, resulting in an appearance of impropriety. At oral argument, Muhammad's counsel stated she was only seeking to have Milan replaced on a prospective basis.

¶ 133    At no point has Muhammad argued that Milan's appointment as special prosecutor violated his due process rights. Arguments not raised in an opening brief are "forfeited." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Our supreme court has cautioned that "[a] reviewing court should exercise its power to raise unbriefed issues only sparingly, to avoid assuming a role of advocacy and being forced to speculate as to arguments the parties might have presented had the issues been raised." *Jackson v. Board of Election Commissioners of the City of Chicago*, 2012 IL 111928, ¶¶ 33-34; *People v. Givens*, 237 Ill. 2d 311, 323-24 (2010). Our inquiry should be whether Milan suffers an actual conflict of interest under section 5/3-9008 (a-10) of the Counties Code (55 ILCS 5/3-9008 (a-10) (West 2020)) and the Illinois Rules of Professional Conduct, nothing further.

¶ 134    Despite requesting review of then Presiding Judge Martin's and Presiding Judge Reddick's rulings, Muhammad did not cite the standard of review that is applicable here. Citing *People v. Peterson*, 2017 IL 120331, ¶ 10, the majority contends that because the facts are not in dispute

our standard of review is *de novo*. Supra ¶ 81. The majority's reliance on *Peterson* is misplaced because there, the defendant claimed that his counsel labored under a *per se* conflict of interest under the sixth amendment where the attorney entered into a media contract regarding the case. Muhammad has not argued at any time that Milan labored under a *per se* conflict of interest under the sixth amendment.

¶ 135　　　In undertaking *de novo* review, the majority has imposed a far less deferential standard of review on Muhammad's only claims, that Milan suffers an actual conflict of interest under section 5/3-9008 and the Illinois Rules of Professional Conduct. Moreover, and contrary to the majority's conclusion, even where the facts are undisputed, the trial court still has discretion in making certain decisions. *Farmer v. Cook Cty. State's Attorney's Office (In re Appointment of Special Prosecutor)*, 2019 IL App (1st) 173173, ¶ 20 (citing *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 123 (1998)). The Counties Code provides that the circuit court "may appoint" a special prosecutor when the State's Attorney suffers from an actual conflict of interest. 55 ILCS 5/3-9008 (a-10) (West 2020); compare with 55 ILCS 5/3-9008 (a-15) (West 2020) ("the court shall appoint a special prosecutor" when the State's Attorney recuses). Because the legislature employed the word "may," this court has held that the decision to appoint a special prosecutor rests in the sound discretion of the trial court. *Farmer*, 2019 IL App (1st) 173173, ¶ 20. Indeed, our supreme court long ago explained that the statute,

　　　"clearly gives the courts of this State the power to appoint special State's attorneys under some circumstances. To properly construe the statute and determine what will and what will not present a proper case for such appointment clearly involves the exercise of judicial power, and it is easy to see that different courts might differ as to the extent and character

of the interest of the Attorney General or State's attorney which would justify the appointment of a special officer under the statute." *Lavin v. Board of Comm'rs*, 245 Ill. 496, 502 (1910).

¶ 136 Consequently, our review of the circuit court's decisions to deny Muhammad's successive motions to rescind Milan's appointment as special prosecutor under section 5/3-9008 is for an abuse of discretion only. *Farmer*, 2019 IL App (1st) 173173, ¶ 20 (determining that abuse of discretion standard applies to decision regarding appointment of special prosecutor). Likewise, the determination as to whether counsel should be disqualified under the Rules of Professional Conduct is left to the sound discretion of the trial court and will not be disturbed on review absent an abuse of discretion. *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997). An abuse of discretion occurs when the decision of the circuit court is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the court. *People v. Simmons*, 2019 IL App (1st) 191253, ¶ 9.

¶ 137 No abuse of discretion can be found here. To review, on August 20, 2020, the Office of the Special Prosecutor (OSP), which Milan led, filed a motion before Judge Flood to terminate the proceedings in Muhammad's case. On November 16, 2020, Muhammad filed both a motion to strike the OSP's motion to terminate proceedings and a motion to rescind Milan's appointment as the special prosecutor on the basis that Milan had not been properly appointed pursuant to section 5/3-9008 (c) and (a-20), that Milan suffered from the same *per se* conflict of interest as prior State's Attorney Richard Devine, and that Milan suffered from an "actual or apparent" conflict of interest based on his previous employment with the CCSAO. Milan filed an objection, arguing that he was properly appointed in the Burge cases pursuant to sections 5/3-

9008 (c) and (a-20) and that he did not suffer from a conflict of interest based on his previous positions with the CCSAO. Milan argued that he "did not personally prosecute Muhammad, made no decisions on the case nor had any involvement in the case whatsoever." In addition, Milan argued that then Presiding Judge Martin had recently ruled that the CCSAO, including State's Attorney Kim Foxx, "no longer has a conflict representing the State in Burge related matters" and therefore if Foxx and her office were not conflicted, neither was Milan. Muhammad filed a reply, arguing again that Milan was not properly appointed under sections 5/3-9008 (c) and (a-20) and that Milan suffered from a conflict of interest.

¶ 138    At the hearing on Muhammad's motion, Milan argued, "this is really a thinly veiled attempt to forum shop prosecutors[,] the attorney of record in this case since the beginning, Candace Gorman, is unhappy with decisions I made on both the Muhammad case and the Donald Elam case, a case that was in front of your Honor." Milan further argued:

"Let's fast forward to September 14, 2018. Candace Gorman, the attorney of record on this case, files a motion with you, your Honor, with Judge Martin -- and me, by the way, notices me -- asking your Honor to assign the Muhammad case to a judge that never was an Assistant State's Attorney. Notices me up on that because she recognized me as the special prosecutor on these cases since 2017.

On November 7, 2018, Candace Gorman files a notice of motion with you, your Honor, and with me--again, notices me on it--to appoint a special prosecutor.

On November 20th, 2018, you appointed our office in her presence. She's in your courtroom. And on your half sheet, reflects your appointment of our office. No objection by Candace Gorman about how your-- your appointment of me was unperfected or that I

have some kind of conflict. Nothing. She wanted us on there.

Between November 20th, 2018 and today, I have more than a dozen emails from Attorney Candace Gorman to me and the O'Rourke law firm about the Muhammad case. And I am not going to go through all the dozens of them, your Honor, but I will note two of them.

January 2019, she reaches out to TIRC for more documentation and to me asking for more documentation, and TIRC emails both of us. The email goes to Candace Gorman and to me regarding the materials they are going to send over. There is no objection by [Ms.] Gorman about my serving as the special prosecutor. She wanted me.

May 2019, she files a Rule to Show Cause against the Chicago Police Department. She files it in front of Judge Flood and serves me with it in order to get documents from the Chicago Police Department. No objection to me. She actually serves me on it, wants me to help her on this.

What then happens? We exchange discovery over months on the Muhammad case. She calls for a meeting with me in person to talk about the case where she requests a reinvestigation of the Muhammad case. She hands me this (indicating). This is her request for new investigation of the conviction of Abdul-Malik Muhammad, pages and pages of documents that she asks me to review.

And based upon her request, I do so. I tell her that I am going to initiate a reinvestigation. Don't confirm that I am going to do a whole investigation. I need to see if what she is telling me is it accurate and confirm what she does. So I begin to do so. I go through hundreds of pages of documents to start the reinvestigation.

As part of that, I interview Mr. Abdul-Malik Muhammad with her, okay. We do a Zoom interview of Mr. Muhammad. I go through the investigation. I get to the point where there is just too much evidence against him. All right. There is no way that I can continue the investigation and bill the County for an investigation that I know is going nowhere. And I make a determination to proceed against Mr. Muhammad. I inform [Ms.] Gorman of that, and then I filed a motion to terminate these proceedings in front of Judge Flood.

It is important to note that during the same period of time, from 2018 to 2020, I am serving as the special prosecutor on a case called Donald Elam, which is a Burge-related case, and which [Ms.] Gorman was the attorney of record the entire time in front of your Honor. At no time does she object to my-- does she claim that your appointment of me was unperfected or the appointment of my office was unperfected or that I had a conflict."

¶ 139       On December 1, 2020, Judge Martin, then Presiding Judge of the Criminal Division, denied Muhammad's motion, finding that Milan's appointment as special prosecutor in the "Burge cases" complied with section 5/3-9008(a-20), and that his appointment in this case likewise complied with section 5/3-9008(c). Judge Martin further found that:

"[T]his argument that you are raising about how the court went about appointing Mr. Milan in this particular matter, this issue -- I am just troubled by the fact that this issue is being raised now all these many years after this was -- this issue first appeared before the court. And, frankly, I don't think that that's — it's appropriate, and it appears to me that -- as Mr. Milan has stated, that now this argument arises as Mr. Muhammad is dissatisfied with how the litigation has gone. And so, that-- that, I find to be-- I find that to be troubling."

¶ 140    On January 7, 2021, Muhammad filed a motion to reconsider then Presiding Judge Martin's order denying his motion to rescind. Therein, Muhammad again argued that Milan was not properly appointed pursuant to the statute and Milan's background as an assistant State's attorney prevented him from being named special prosecutor in this case. On January 18, 2021, Milan filed a motion to strike Muhammad's motion to reconsider, asserting that Muhammad's motion to remove him was untimely, Milan's appointment was proper under the Illinois statute, and Milan did not suffer from a conflict of interest. Judge Reddick was named Presiding Judge of the Criminal Division shortly thereafter. On January 21, 2021, Presiding Judge Reddick struck Muhammad's motion for reconsideration of then Presiding Judge Martin's December 1, 2020, Order, finding that the motion stated no new grounds and therefore it would be improper "to reconsider the prior sitting judge's decision."

¶ 141    Thereafter, on April 6, 2021, Muhammad filed a "new motion to rescind appointment" on the grounds that Milan had an actual conflict, this time because Muhammad may call Milan as a witness. Muhammad stated that defense counsel had uncovered a memorandum addressed to Milan from an assistant state's attorney in 1999 in another, unrelated case that arose almost two years prior to Muhammad's arrest, describing visible injuries to a suspect's face after arriving at the Area 4 police station. The suspect later told the assistant that two unidentified "men" came into the room and kicked him as he was sleeping on the floor. The suspect did not see the men. The assistant relayed this information to the "Deputy Supervisors in Felony Review." Muhammad claimed that this memorandum made clear that "the practice within the CCSAO was to inform Mr. Milan in instances when police misconduct became known or apparent." Milan filed an objection to Muhammad's successive motion to disqualify on May 18, 2021.

¶ 142     On July 30, 2021, after hearing argument, Presiding Judge Reddick delivered a lengthy oral ruling denying Muhammad's motion. She found that Milan's initial appointment was proper and that Muhammad had not "shown sufficient facts and evidence that Milan has a conflict of interest in this case." Presiding Judge Reddick's oral ruling bears quoting at length because she, like then Presiding Judge Martin, comprehensively explained why Muhammad's arguments lacked merit and thoughtfully and cogently exercised her discretion:

"Under the statute, the person bringing the motion, the petitioner in this case, must plead specific facts to show that the State's Attorney is either sick, absent, unable to attend, or has a conflict of interest.

* * *

Now, in this case, the Court specifically finds that the controlling authority is the current version of the statute found at 55 ILS -- ILCS 5/3-9008. And based on the interpretation of that version of the statute, the current version, it does seem to disavow the [appearance of impropriety] language that was cited. And I believe that['s] derived from the Lang decision, L-A-N-G, with respect to the issue of appearance of impropriety.

* * *

The Court turns then to the issues of whether the petitioner has shown that Special Attorney Milan has a conflict of interest under the laws.

Now, the -- part of the claim is really that Milan's previous positions as supervisor of the Felony Review Unit and First Assistant State's Attorney create a conflict in the TIRC proceedings; that, specifically, Special Attorney Milan was the direct supervisor for the Felony Review Unit at the time that the petitioner's case was proceeding; and that he was

not only responsible for the training of Felony Review Attorneys, but he was also responsible for their direct supervision. And the Court does clearly consider this claim under the statutory provision.

In doing so, the Court determines that, although Special Attorney Milan was the supervisor of the Felony Review Unit, and, again, the petitioner has detailed that he not only was the supervisor, but he had, in essence, responsibility for these attorneys who reported to him and that he was responsible for their direct supervision, the Court will consider that.

Under the standard of the statute as it currently exists, without evidence of Special Attorney Milan's direct involvement, the Court does ultimately determine that the conflict of interest claim is not supported.

* * *

So returning to the prior point with respect to the conflict, the Court did again consider and find that the petitioner has not shown that Attorney – Special Attorney Milan participated directly in or was at all involved in Petitioner's case beyond his responsibility as the supervisor. And that without evidence of Attorney Milan's direct involvement, the Petitioner's claim of a conflict of interest is not supported, is not shown.

* * *

But the Court concludes that even under the standard as it is discussed within the Relevant authority, it does not appear, again, at this point the petitioner has made an adequate showing.

Now, the Court does look to our Illinois Rules of Professional Conduct for

instruction as to how we determine. And if we look at Rule 5.1, that addresses supervising attorneys. And I'll just read the formal title, The Responsibilities of Partners, Managers, and Supervisory Lawyers.

When you look at the language of that particular ethical rule for instruction, for guidance, it talks about the supervising attorney having to have actual knowledge to be held accountable for subordinate attorneys' unethical actions. And I don't think that's instructive because in this instance, and, particularly, in the face of Attorney Milan's denials during argument and offer to provide an affidavit, he has stated that he had no involvement or engagement in the case, direct or otherwise, during the time that he was in the office.

* * *

However, once again, as we look at the actual controlling language of the law, as well as how it has been interpreted, it -- again, the petitioner has not made the showing under the law that at this time there has been a showing that Attorney Milan had any direct knowledge or participation. And there's not a showing that he had any actual knowledge with respect to the actions of either the Felony Review State's Attorneys who are alleged to have engaged in certain acts that caused concern and are the basis for claims that are currently pending before the Court or the Assistant State's Attorneys who were assigned to the felony trial division who actually tried the case.

This is important because there were claims that there are police reports that were not tendered by the State's Attorneys to the defense before trial, that there was specific information within the reports that several witnesses, and I believe there might have been five, were unable to identify the petitioner during the police investigation at the time during

which he was held in question, that that information was not tendered to defense counsel or Petitioner Muhammad before trial. And that the significance of these actions by or inactions by either the Felony Review Assistants or the Assistant State's Attorneys who actually tried the case, that those are matters over which Mr. Milan held some measure of responsibility.

But as the law and the governing provisions and as the Court considers them, to hold Special State's Attorney Milan accountable without a showing that he had direct knowledge would, in essence, set a precedent that every managing or supervising attorney would be presumed to have actual knowledge of all subordinate attorneys' conduct. And I don't believe that's the reach of the law at this point. And, again, I'm looking to ethical rules for guidance as I interpret how the Court should consider the claims here.

I also do note that prior to Attorney Milan's 2018 appointment as Special Prosecutor, that he sought and obtained an expert advisory opinion. This was from an individual named Stephanie, S-T-E-P-H-A-N-I-E, middle initial L, last name Stewart, S-T-E-W-A-R-T, who was senior counsel to the administrator of the ARDC. And this individual opined that Special Attorney Milan did not have a conflict of interest that would prohibit him from serving. And this was based on the finding that his supervisory role was too attenuated from [Detective McDermott] to create a conflict of interest.

I further note, however, that petitioner also engaged the services of Professor Andrew, common spelling, Kent, K-E-N-T. And he provided an affidavit analyzing these very facts before the Court as well and reached an opposite conclusion.

He, in essence, determined that, excuse me, the conclusions of Attorney Stewart

* * *[f]ailed to directly address the concerns raised by the ethical rules regarding Rule 1.11 and, specifically, Rule 1.7, excuse me, the conflict of interest.

And, ultimately, the conclusion of the petitioner's expert is that Attorney Milan does have a personal interest, in essence, in ascertaining or upholding the work of the State's Attorney's Office because there is a significant risk or that there is a conflict of interest because -- and I'll quote here. There is a significant risk that Milan's representation of the People as a Special Prosecutor in this case will be materially limited by personal interest of Milan's.

And it was explained in greater detail. And this was under Illinois Rule of Professional Conduct 1.7(a)(2).

Again, as the Court looks to the specific issues in this case that arise, the claim of a significant risk that he will be material[ly] limited, again, is not a sufficient showing under the language of the statute that there -- if he established that there is evidence that he has an actual conflict or per se conflict. Even as I look at the language for, again, the appearance of impropriety, at this stage, based on the information the Court has, I do ultimately conclude there has not been the showing, the requisite showing.

I do also want to make clear, however, that should additional evidence come forward showing a direct connection between Special Attorney Milan and the petitioner's case, his direct involvement, his direct knowledge, that certainly it will be important that those matters are brought before the Court because then there would be a showing, and that is what is not present and what is necessary."

¶ 143    Presiding Judge Reddick then addressed Muhammad's claim that Milan suffered from a

conflict of interest because Muhammad may potentially call him as a witness. Presiding Judge Reddick stated:

"And in this instance the petitioner has indicated its desire, as well as its intention, to call Special Attorney Milan as a witness with respect to discovering or learning his information about the procedures, about his supervision of the attorneys involved in the case back at that time. But, in essence, there really would still need to be a showing for the need to call Attorney Milan to testify at an evidentiary hearing.

The petitioner specifically alleged that Attorney Milan has important knowledge regarding the alleged prosecutorial and police misconduct. And that petitioner -- that counsel expects that once the petitioner is allowed to call Mr. Milan as a witness, he will be -- the petitioner would be entitled to full discovery, not only as to all the memos from Felony Review at the pertinent time, but also Mr. Milan's knowledge of torture by the Chicago Police Department, the processes in place when confronted with evidence of that torture, and also the training to his subordinates on this crucial subject. Again, in the face of that, Attorney Milan stated that he has no personal knowledge of the circumstances of the petitioner's case.

And in this instance, even given the wide reaching bases upon which the petitioner would seek to call Special Attorney Milan, that's a hurdle that still has to be overcome. It is not a certainty that he would be called as a witness. There must be a showing that that is, therefore, necessary information for the matter to proceed.

In this instance it's as if the petitioner -- and it is -- the petitioner is asking me to declare that because there might be a conflict I should disqualify him now. And I think it's

putting the cart before the horse. There has to be established that there is the conflict to have him removed. You can't say there might be a conflict, so remove him.

At this point there has to be a showing, a sufficient showing, that there is enough of a conflict for that to occur. And I repeat again if there is that showing, this matter should be brought before the Court for the Court then to make these determinations."

¶ 144     Finally, Presiding Judge Reddick found that Muhammad forfeited his claim to have Milan removed as special prosecutor by failing to bring his motion until two years after Milan was appointed. She stated:

"But I do note that the petitioner has known about Special Attorney Milan's appointment as the Special Prosecutor since the beginning stages of this TIRC petition, and that dates back to 2018. And I note that Judge Byrne had appointed Attorney Milan as Special Prosecutor back in 2017.

And in this instance the petitioner is the one who sought Special Attorney Milan's appointment as Special Attorney for the petitioner's matters. And after Special Attorney Milan became engaged with the matter, the discovery process happened, the initial investigation that Special Attorney Milan conducted, and the petitioner submitted to an interview with Attorney Milan in the presence of petitioner's counsel. That only after these matters occurred and Special Attorney Milan announced that he would proceed with the prosecution, it was at that time that the initial motion to rescind occurred and then, ultimately, the new motion that is currently before the Court. * * *

Now, petitioner's counsel did explain to the Court that it was only after additional measures she took to obtain information did she become more fully aware of Special

Attorney Milan's role as supervisor of the Felony Review Unit at the relevant time. But even giving consideration to that, the concern for the Court is the timing then of the motions to rescind while petitioner had knowledge of Special Attorney Milan's roles within the State's Attorney's Office. And that only after the passage of almost two years, only after learning that petitioner – that Special Attorney Milan, who pursued the prosecution versus dismissing it, did then the petition to rescind surface.

And I do think under the language of the term forfeiture, that failure to raise the issue in a timely manner really speaks to the concern about it being raised now."

¶ 145    Turning to the law governing this dispute, article VI, section 19, of the Illinois Constitution provides for the election of a State's Attorney in each county. Ill. Const. 1970, art. VI, § 19. The powers and duties of a State's Attorney include commencing and prosecuting all actions, civil and criminal, in which the people of the State may be concerned. 55 ILCS 5/3-9005(a)(1) (West 2020). A special prosecutor may be appointed when the State's Attorney suffers from an actual conflict of interest. *Id*. § 5/3-9008 (a-10). An actual conflict of interest occurs when the State's Attorney "is interested in" the case as either (1) a private individual, or (2) an actual party to the action. *In re Appointment of a Special State's Attorney on Behalf of Hanley*, 2020 IL App (2d) 190845, ¶ 17. Section 5/3-9008 also applies to the removal of a special prosecutor. *In re Appointment of Special State's Attorney*, 305 Ill. App. 3d 749, 758 (1999). Milan is not an actual party to the action, so the only issue is whether he is interested in Muhammad's case as a private individual. "When the alleged interest is personal, a defendant must show either (1) that the relationship involves significant emotional ties; or (2) that defendant suffered 'actual and substantial prejudice.' " *People v. Arrington*, 297 Ill. App. 3d 1, 3 (1998) (citing *People v.*

*Polonowski*, 258 Ill. App. 3d 497, 502 (1994)).

¶ 146     Contrary to Muhammad's argument, the appearance of impropriety is no longer enough to establish that a prosecutor harbors an actual conflict of interest under section 5/3-9008. Under the current version of section 5/3-9008, which was amended in 2016 to expressly add the "actual conflict of interest" language, the party seeking a special prosecutor must demonstrate an actual conflict of interest, not merely the appearance of impropriety. *Farmer*, 2019 IL App (1st) 173173, ¶¶ 33-39. Therefore, the line of cases under the pre-amended version of the statute that holds that the appearance of impropriety is sufficient to remove a prosecutor no longer apply. *See e.g. People v. VanderArk*, 2015 IL App (2d) 130790, ¶ 38 (citing preamended version); *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 461 (citing preamended version); *People v. Lang*, 346 Ill. App. 3d 677, 682 (2004) (citing preamended version). The majority correctly points out that the court in *People v. Benford*, 2022 IL App (2d) 200349-U, ¶ 39, stated the appearance of impropriety was enough to disqualify a prosecutor, but that court cited cases interpreting the pre-amended version of the statute and did not analyze the text of the amended version of the statute adding the "actual conflict of interest" language.

¶ 147     Muhammad bears the burden of proving by sufficient facts and evidence that the special prosecutor has an actual conflict of interest in a specific case requiring the appointment of a new special prosecutor. 55 ILCS 5/3-9008 (a-10) (West 2020); *Arrington*, 297 Ill. App. 3d 1, 4 (1998); *Farmer*, 2019 IL App (1st) 173173, ¶ 44 n. 3. Absent such facts, Milan has no burden to show that he was not conflicted. *Arrington*, 297 Ill. App. 3d 1, 4 (1998) (distinguishing *People v. Courtney*, 288 Ill. App. 3d 1025, 1034 (1997), where prosecutor had a *per se* conflict, in which case prosecutor bears burden to show no conflict).

¶ 148    Our precedents demonstrate that a defendant bears a substantial and exacting burden to remove a prosecutor on the basis that he has a personal interest in the matter under section 5/3-9008 of the Counties Code. See e.g. *E.H. v. Devine (In re Harris)*, 335 Ill. App. 3d 517, 525 (2002) (juvenile's allegations that two police detectives and an assistant state's attorney conspired to present perjured testimony at a probable cause hearing and that the brother of one of the police detectives was an assistant state's attorney who was also the supervisor of the Organized Crimes Division did not show that the state's attorney was an interested party and, therefore, should be disqualified); *People v. Tracy*, 291 Ill. App. 3d 145, 150 (1997) (the trial court did not abuse its discretion in denying the defendant's motion for the appointment of a special prosecutor, which alleged that one of the assistant State's Attorneys who had initially been involved in the case was going to testify as a witness at trial regarding an incriminating statement made by the defendant in court); *People v. Morley*, 287 Ill. App. 3d 499 (1997) ("[t]o hold that a special prosecutor must always be appointed whenever a victim or witness is employed by a state, county, or local agency would be an illogical, as well as impractical, encroachment upon the authority of a constitutional officer."); *People v. Max*, 2012 IL App (3d) 110385, ¶ 62 (finding no abuse of discretion in the trial court's decision not to appoint a special prosecutor even though the victim was the brother of the county sheriff and had made campaign contributions to the state's attorney); *Farmer*, 2019 IL App (1st) 173173, ¶ 20 (no inherent conflict of interest any time the state's attorney is called upon to investigate and prosecute police-involved shootings); *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 52 (holding no special prosecutor was required even though an assistant state's attorney was the complaining witness against defendant in an unrelated case); *People v. Bickerstaff*, 403 Ill. App. 3d 347, 354

(2010) (holding that the defendant failed to show that the state's attorney's public criticism of his predecessor's handling of the defendant's case warranted removal).

¶ 149  Muhammad has failed to meet his initial burden to offer facts or evidence to show that Milan played any role in Muhammad's interrogation or prosecution for Mim's murder. The majority's assertion that "the undisputed facts show Milan exercised a quasi-judicial power as Supervisor of the Felony Review Unit in the Cook County's State's Attorney's Office that charged Muhammad with first-degree murder" (supra ¶ 94) is as ambiguous as it is misleading, for it suggests that because Milan supervised the Felony Review Unit he made the decision to charge Muhammad. But there is no such evidence in the record. Similarly, there is nothing in the record to support the majority's assertion that Milan had a "relationship" with McDermott (supra ¶ 80) or that McDermott's position with the CCSAO aligned with or overlapped Milan's work-related responsibilities (supra ¶ 100). Further, Muhammad has not alleged at any time that any assistant state's attorneys working in the felony review unit were present for, played a role in, or were aware of his alleged torture. There is no indication in the record or in Muhammad's complaint that suggests that an assistant state's attorney was even present when Muhammad provided the subject statement to Detectives Fidyk and McDermott. And even if Milan was involved in charging Muhammad, Milan would still not harbor an actual conflict of interest. Muhammad has not cited any case disqualifying a prosecutor based on police wrongdoing imputed to the prosecutor. To the contrary, in *McCall v. Devine*, 334 Ill. App. 3d 192, 205 (2002), we held that allegations of police misconduct were not sufficient to establish that the State's Attorney was personally interested in the case, and appointing a special prosecutor without specific facts would "open the door to requiring a special prosecutor to be appointed any time a police officer

is suspected of wrongdoing." Muhammad has not come forth with any evidence showing Milan participated in, or knew of, Muhammad's alleged tortured confession.

¶ 150    The majority acknowledges that a defendant must establish an "actual conflict of interest" under section 5/3-9008 (a-10) for the appointment and removal of a special prosecutor and may not rely on speculation or suspicion (*McCall*, 334 Ill. App. 3d at 205), but the majority cites no actual facts tying Milan to Muhammad's torture or subsequent prosecution and relies solely on the fact that he held a supervisory position in the CCSAO. Lacking any actual evidence, the majority improperly engages in speculation and supposition in finding that Milan has an actual conflict. As Presiding Judge Reddick reasoned, there is simply no evidence of any disqualifying connection between Milan and Muhammad.

¶ 151    The majority cites *People v. Lang*, 346 Ill. App. 677 (2004), for the proposition that when an error casts doubt on the integrity of a proceeding, we have a constitutional duty to act. Supra ¶ 85. In *Lang*, after a hearing related to the defendant allegedly driving with a revoked license, an assistant state's attorney followed the defendant out of court and hid behind potted plants to watch the defendant drive away from the courthouse. The assistant state's attorney then contacted police to inform them that the defendant was driving without a license. *Id*. at 678-79. The assistant state's attorney then prosecuted the case until trial, when another attorney from the Lake County State's Attorney's Office prosecuted the case. *Id*. at 679. The assistant state's attorney who witnessed the alleged crime was the State's chief witness at trial. *Id*.

¶ 152    On appeal, the Second District found that the defendant's prosecution created an appearance of impropriety because the assistant state's attorney surreptitiously followed the defendant until he observed the defendant commit a crime, which resulted in charges. *Id*. at 684. The reviewing

court believed that "the aggressive behavior toward the defendant created the appearance that the State's Attorney's office was obsessed with finding evidence against the defendant to obtain a conviction against him at all costs." *Id*. "These facts created an improper appearance that the State was too involved with the underlying case to be fair in its prosecution of the defendant." *Id*.

¶ 153    Aside from the obvious factual differences (*id*. at 685 ("we emphasize that our holding is based on the specific facts of this case")), *Lang* is inapplicable here. *Lang* does not impose a duty on this court, constitutional or otherwise, to remove Milan from this case. Rather, the *Lang* holding was based on the statutory language, "is interested in any cause or proceeding" in the preamended version of section 5/3-9008 of the Counties Code (55 ILCS 5/3-9008 (West 2014)). *Id*. at 681. In the 2016 amended version of section 5/3-9008 (a-10), that language has been replaced with "the State's Attorney has an actual conflict of interest in the cause or proceeding." 55 ILCS 5/3-9008(a-10) (West 2016). This "actual conflict of interest" language forecloses the possibility of a special prosecutor being appointed where there is the mere "appearance of impropriety." *Farmer*, 2019 IL App (1st) 173173, ¶ 39.

¶ 154    The majority's reliance on *People v. Courtney*, 288 Ill. App. 3d 1025, 1034 (1997), is also misplaced because it involved a prosecutor's *per se* conflict of interest. There, the defendant's former counsel became the state's attorney of Kankakee County before the defendant's trial. The prosecutor assigned to the case assured the court that the Attorney General's office would be taking over the prosecution. However, just before trial, the prosecutor announced without explanation that the Attorney General's office would not be entering the case and that the State was ready for trial. The defendant did not object at that point but raised the issue in a posttrial

motion and on appeal. Under those circumstances, the appellate court overlooked the forfeiture and reversed the defendant's conviction, finding that a special prosecutor was required when a defendant's trial counsel accepts a managerial position in the office that is prosecuting the defendant where that attorney was "intimately involved in the defendant's representation before becoming State's Attorney" and made "numerous court appearances on behalf of the defendant and was clearly privy to the defendant's confidences." *Id.* at 1031, 1034, 1037. Unlike in *Courtney*, Milan never represented Muhammad. Thus, Muhammad did not establish that Milan suffered an actual conflict of interest under section 5/3-9008 (a-10) on account of a personal interest in his case.

¶ 155    Nor does Milan suffer a conflict of interest under Rule 1.7(a)(2) or Rule 5.1(b) of the Illinois Rules of Professional Conduct. Rule 1.7(a)(2) provides: "(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if * * * (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." lll. R. Prof'l. Conduct (2010) R. 1.7 (a) (eff. Jan. 1, 2010). Rule 5.1(b) provides that "[a] lawyer having supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct." Ill. R. Prof'l Conduct (2010) R. 5.1(b) (eff. Jan. 1, 2010).

¶ 156    A party seeking to disqualify counsel under the Rules of Professional Conduct bears the burden of proving a conflict of interest. *Franzoni v. Hart Schaffner & Marx*, 312 Ill. App. 3d 394, 400 (2000). Disqualification is a drastic measure. *In re the Commissioner of Banks and*

*Real Estate*, 327 Ill. App. 3d 441, 478 (2001).

¶ 157    As explained above, Muhammad did not offer any evidence that Milan had a personal interest in Muhammad's case. Contrary to Muhammad's argument, the 1999 memorandum from an assistant state's attorney to Milan does not constitute evidence of Milan's personal involvement because it describes a separate, unrelated case involving different detectives that occurred almost two years prior to Muhammad's arrest. There is similarly no evidence that Milan, in this supervisory capacity, was aware of any alleged *Brady* violations that occurred related to Muhammad's prosecution.  Accordingly, Muhammad failed to meet his burden to establish that Milan suffered a conflict of interest under Rule 1.7(a)(2) or Rule 5.1(b) of the Illinois Rules of Professional Conduct. Therefore, Judge Reddick did not abuse her discretion in denying Muhammad's request to disqualify Milan on this basis.

¶ 158    Unable to find a basis to conclude that Milan suffers an actual conflict of interest under section 5/3-9008 (a-10) or the Illinois Rules of Professional Conduct, the majority cherry picks two sentences from the second to last paragraph of Muhammad's 46-page opening brief, announces that Muhammad has advanced a due process argument, and sets out to resolve this phantom argument by repeatedly equating Milan's role as special prosecutor with that of a sitting judge. To be clear, the words "due process" appear but once on the last page of Muhammad's opening brief and not at all in his reply brief. The majority has manufactured Muhammad's due process argument out of the whole cloth, denying Milan an opportunity to respond, in derogation of our supreme court's repeated admonition to avoid assuming the role of advocate. *People v. Givens*, 237 Ill. 2d 311, 324 (2010) (appellate court raising an issue *sua sponte* was a violation of well-established principles); *People v. Rodriguez*, 336 Ill. App. 3d 1,

14 (2002) (we must refrain from raising unbriefed issues, to avoid having the "effect of transforming this court's role from that of jurist to advocate").

¶ 159    The majority concludes that due process does not allow, and we must not tolerate, the "*risk of actual bias*" that Milan's personal participation in this case presents. Supra ¶¶ 96, 101 (emphasis added.). The majority points out that "decades of torture by Chicago police took place before the courts and legislature acted" and quotes an article which states that "the crisis of police torture is more far reaching than the 'bad apples' myth suggests." In so doing, the majority effectively holds that under a due process analysis, the appearance of impropriety is sufficient to remove a special prosecutor. Cf. *Farmer*, 2019 IL App (1st) 173173, ¶¶ 33-39 (under the current version of section 5/3-9008, the party seeking a special prosecutor must demonstrate an actual conflict of interest, not merely the appearance of impropriety). The implication of the majority's finding is that Muhammad's unsupported allegations of guilt by association are enough to have Milan removed from this case.

¶ 160    The phrase "risk of actual bias" in the due process context is generally found in cases involving a defendant's motion for substitution of judge for cause. A motion for substitution of judge for cause is heard by a second judge, allaying due process concerns, and "ensures that any substitution coming after a substantive ruling has been made is the result of a proven bias or high probability of the high risk for actual bias and is not a mere ploy for tactical advantage." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 46. However, the forced removal of a judge in such circumstances requires that actual prejudice, "that is, either prejudicial trial conduct or personal bias," be established. *Id*. at ¶ 30. It is not enough for a defendant to allege there is a potential appearance of impropriety, as it does not equate to actual prejudice. *Id*. at ¶ 43; *People*

*v. Klein*, 2015 IL App (3d) 130052, ¶ 89.

¶ 161    Milan is not a judge, nor is he acting as one here. Nevertheless, quoting *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016), the majority finds that because Milan had quasi-judicial power as supervisor of the felony review unit that charged Muhammad with first-degree murder, Milan now has the improper ability to "judge himself and his subordinates" because he is required to assess "the validity of his original decision to prosecute," thereby violating Muhammad's due process rights. Supra ¶ 94. Again, there is no evidence in the record that Milan had any role in the decision to charge Muhammad. In any case, Milan in no sense is acting as a "judge" in this case.

¶ 162    The majority attempts to find a due process violation by equating Milan's position as special prosecutor in this case to that of the "sitting justice" in *Williams*, who "had the opportunity to rule on a collateral appeal by the same defendant when decades earlier as a prosecutor, the judge had authorized the seeking of the death penalty." *Williams*, 579 U.S. at 9. This analogy falls flat because Milan had no such power in this case. Moreover "there is general agreement that prosecutors' participation in a case is not subject to the same conflict of interest rules that govern judges." *State v. Galindo*, 315 Neb. 1, 54 (2023) (citing *Young v. U. S. ex rel. Vuitton et Fils S. A.*, 481 U.S. 787 (1987); *People v. Vasquez*, 39 Cal. 4th 47 (2006)). That is because prosecutors, unlike judges, are not disinterested parties to criminal prosecutions. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980) ("Prosecutors need not be entirely 'neutral and detached' "); *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) ("[o]f course, a prosecutor need not be disinterested on the issue of whether a prospective defendant has committed the crime with which he is charged"). Moreover, the United States Supreme Court

does not appear to have expressly recognized a due process right to a conflict-free prosecutor. See *Galindo*, 315 Neb. at 53.

¶ 163    Rather, the farthest the United States Supreme Court appears to have gone is to state that a prosecutor's personal conflict of interest "may" "in some contexts raise serious constitutional questions." *Marshall*, 446 U.S. at 249-50. Regardless, the majority ventures far afield with its novel "judge in his own case" due process theory. "It is well settled that the American prosecutor plays a special role in the search for truth: the prosecutor's interest is in seeing that justice is done, not winning a case." *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 78 (citing *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (citing *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). The appointment of a special prosecutor does not change the objective of the office, nor is there anything in the record showing that Milan's role as special prosecutor in this case is inconsistent with the search for truth. The cornerstone of the majority's analysis – that Milan became the judge of his own case – crumbles under its own weight because there is no evidence in the record that Milan had any involvement in Muhammad's prosecution, let alone any alleged police or prosecutor wrongdoing. Milan is no more a judge of his own case than any other prosecutor would be in seeking the truth in this or any other case.

¶ 164    Under the majority's reasoning, a postconviction petitioner could disqualify a prosecutor by simply alleging prosecutor or police misconduct because such allegations would call on the prosecutor to "judge" his own conduct or the decision to prosecute or the conduct of police. But no court has ever adopted such an expansive due process theory of prosecutor conflict. And for good reason. Appointing a special prosecutor implicates the public prosecutor's duty as an elected officer under the Illinois Constitution to represent the People (*People v. Morley*, 287 Ill.

App. 3d 499 (1997) ("[t]o hold that a special prosecutor must always be appointed whenever a victim or witness is employed by a state, county, or local agency would be an illogical, as well as impractical, encroachment upon the authority of a constitutional officer")), and the fiscal purse because counties are responsible for the special prosecutor's fees (55 ILCS 5/3-9008(b) (West 2020)). Moreover, TIRC proceedings, like postconviction proceedings, are civil matters. "Judicial review of a TIRC disposition is a civil proceeding, akin to the third stage of a postconviction proceeding, which is also civil in nature." (Internal quotations omitted.). *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85. As this court explained in *People v. Christian*, 2016 IL App (1st) 130030, ¶ 78, the Act is unusual in that a claim of torture is considered first by the Commission and then by the circuit court. "Thinking about the process of a torture claim through the lens of the more common postconviction process shows that the initial screening of the claim is roughly comparable to the first stage, the Commission's inquiry and recommendations are the second stage, and the circuit court hearing is the third stage evidentiary hearing." *Christian,* 2016 IL App (1st) 130030, ¶ 78. "If a matter is referred to [the circuit] court, a claimant can receive what is referred to in Illinois as a 'third stage post-conviction hearing.' This means that the claimant can have a full court hearing before a judge to show by a preponderance of the evidence that his confession was coerced." *Id*. (citing State of Illinois Torture and Relief Commission, Mission and Procedure Statement, http://www.illinois.gov/tirc/Pages/default.aspx (last visited Mar. 1, 2016); See also *Whirl*, 2015 IL App (1st) 111483, ¶ 51.

¶ 165      The majority misconstrues Milan's role in these proceedings. As special prosecutor in this case, Milan's role was to represent the State. 775 ILCS 40/50(b) (West 2020). Milan was no

more a "judge" in this case than any assistant state's attorney filing a motion to dismiss or an answer in a postconviction proceeding. Illinois caselaw is replete with instances of assistant state's attorneys representing the People in postconviction cases where petitioners allege that assistant state's attorneys and police officers violated their constitutional rights by obtaining tortured and involuntary confessions or engaging in other misconduct, including specifically not turning over *Brady* material. Following the majority's rationale for its newfound due process right, a public prosecutor would be disqualified from representing the People in such proceedings because they would be called upon to judge themselves. However, Milan's decision that the evidence against Muhammad in this case is overwhelming, and even insufficient to warrant an evidentiary hearing, is no more outcome determinative than a prosecutor's decision to defend a conviction in a postconviction proceeding. The circuit court makes the ultimate decision on whether an evidentiary hearing is necessary following a referral by the Commission and, if so, whether the evidence presented supports a finding for the petitioner. 775 ILCS 40/50(a) (West 2020); *People v. Johnson*, 2022 IL App (1st) 201371, ¶ 74 ("[W]e read the TIRC Act to require the circuit court to hold an evidentiary hearing upon referral from TIRC, *unless* the circuit court finds that the TIRC's finding of 'sufficient evidence of torture to merit judicial review' was 'against the manifest weight of the evidence.' ") (emphasis in original).

¶ 166    The majority then pivots and states that it does not matter if "Milan was personally involved in interrogating suspects or knew that police officers obtained tortured confessions" because he "spent nearly 20 years at the SAO, eventually becoming First Assistant" and is trying to protect his professional reputation. Supra ¶ 106. The majority claims Milan could not possibly be objective in this case because he has a personal interest in his public image and dropping charges

against Muhammad would be seen as an admission of error that would harm Milan's reputation.

¶ 167 Under the law it *does* matter if Milan has a personal interest. Milan's reputation is not at issue here. What is at issue here is whether then then Presiding Judge Martin and Presiding Judge Reddick abused their discretion in denying Muhammad's motions to remove Milan pursuant to section 5/3-9008 (a-10) or the Illinois Rules of Professional Conduct. As Muhammad has not met his burden to prove an actual conflict under section 5/3-9008 (a-10) or the Illinois Rules of Professional Conduct, I would find that the Presiding Judge Martin and Presiding Judge Reddick did not abuse their discretion.

¶ 168 There is simply no evidence that Milan or anyone from the CCSAO played a part in the alleged torture of Muhammad or its alleged coverup or knew of any wrongdoing by Detectives Fidyk or McDermott in obtaining his alleged tortured confession. The fact that Milan supervised the Felony Review Unit or was the First Assistant when McDermott was hired is not indicative of his or the CCSAO's complicity in the police department's pattern and practice of torture. There has to be some actual nexus between Muhammad's case and Milan's involvement. Speculation, supposition and conjecture are not sufficient.

¶ 169 Finally, the majority conveniently ignores the well-reasoned decisions of then Presiding Judge Martin and Presiding Judge Reddick regarding the suspicious timing of Muhammad's motions to rescind Milan's appointment. Not only did they not abuse their discretion in denying Muhammad's motions on the merits, they also did not abuse their discretion in denying Muhammad's motions under the principal of forfeiture. Milan argued below and in this court that Muhammad's successive motions to rescind his appointment were an effort to shop for a more favorable prosecutor. Despite specifically requesting that Milan be appointed in this case,

Muhammad sought to have Milan removed two years after his appointment alleging that Milan had a disabling conflict of interest, but only once Milan moved to terminate the proceedings in this case for lack of evidence supporting Muhammad's claim of torture. Both then Presiding Judge Martin and Presiding Judge Reddick expressly found that the timing of Muhammad's successive motions was highly suspect.

¶ 170    Gorman, however, averred in her affidavit that until mid-September 2020, she "had no idea that Mr. Milan had been an assistant state's attorney in a high-ranking role at the time of [Muhammad's] arrest, torture, and trial." It is not clear from Gorman's affidavit whether she claims she was unaware that Milan had previously been an assistant state's attorney or whether she claims that she was unaware that Milan held a high-ranking position with the CCSAO. However, Milan points out that the 2017 order appointing him in the "Burge" cases expressly states that he is a former First Assistant Cook County State's Attorney. In addition, as Milan advised then Presiding Judge Martin, he had also been appointed the special prosecutor in the case of Donald Elam, another client of Gorman's. Milan advised then Presiding Judge Martin that he was appointed as the special prosecutor in the Elam case on June 6, 2018, and on August 21, 2020, he successfully moved to terminate Elam's case. At no time did Gorman challenge Milan's appointment in the Elam case.

¶ 171    At oral argument, Gorman told us, "It never dawned on me in a million years that the special prosecutor would be coming from that same office because of the nature of what the special prosecutor was doing. So, no, this was the person I was told by the State's Attorney's Office was hearing these [cases] when they recused themselves and to me it's still mindboggling that this is who in fact was appointed." Yet, as far as the judge who was assigned to hear

Muhammad's case, Gorman also told us, "I did ask in my motion for a judge not to have a former State's Attorney for a judge because of the potential for bias but as far as Mr. Milan, I knew nothing about him and I certainly didn't know he was Head of Felony Review at the very time my client was being tortured during Felony Review."

¶ 172    There are many reasons why then Presiding Judge Martin and Presiding Judge Reddick could have determined that Muhammad's motions to remove Milan were gamesmanship and not based on any genuine conflict of interest. In the age of the internet, it is difficult to comprehend how Gorman was not aware of Milan's high-ranking position with the CCSAO. In 2017, Milan had succeeded to the role of special prosecutor in the high profile and newsworthy Burge cases. There had been substantial media coverage of Milan's work as special prosecutor in the Burge cases. By way of example, on July 10, 2019, after Milan was appointed special prosecutor in this case and 16 months before Gorman filed the first of Muhammad's successive motions to disqualify Milan, the Chicago Sun Times published a story under the byline, "Judge to Reconsider if Special Prosecutor Needed for Burge-Related Case," identifying Milan as "a former top deputy to ex-State's Attorney Richard Devine." Chicago Sun-Times, July 10, 2019. In addition, Gorman herself moved for Muhammad's case to be assigned to a judge who had not previously worked for the CCSAO, begging the question why she didn't similarly move as to the special prosecutor that would be assigned to Muhammad's case. Further, Gorman's affidavit is ambiguous regarding her knowledge of Milan's prior association with the CCSAO. Finally, Milan was the special prosecutor in the Elam case with Gorman.

¶ 173    There is a more than ample basis in this record to support then Presiding Judge Martin's and Presiding Judge Reddick's finding that the suspicious timing of Muhammad's motions to

disqualify Milan required their denials under the principle of forfeiture. I would find on this record that Muhammad's bid to have Milan removed was prompted not by any conflict of interest but a desire for a more favorable prosecutor, as Milan argued below and on appeal.

¶ 174   Then Presiding Judge Martin and Presiding Judge Reddick did not abuse their discretion in denying Muhammad's successive motions to have Milan removed from this case based on an alleged conflict of interest under section 5/3-9008 (a-10) and the Illinois Rules of Professional Conduct. Muhammad never raised a due process argument, and in any case his due process rights were not violated.

¶ 175   Accordingly, I would affirm then Presiding Judge Martin and Presiding Judge Reddick's orders denying Muhammad's successive motions to rescind Milan's appointment as special prosecutor in this case.

*People v. Muhammad*, 2023 IL App (1st) 220372

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 00 CR 13572 01; the Hons. Lawrence Flood, LeRoy K. Martin, Erica L. Reddick, Judges, presiding. |
| **Attorneys for Appellant:** | H. Candace Gorman, of the Law Office of H. Candace Gorman, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Robert J. Milan, Special State's Attorney, of Chicago (Alan J. Spellberg, Assistant Special State's Attorney, of counsel), for appellee. |